780 F.2d 240
 54 USLW 2351, 29 Ed. Law Rep. 516
 Jeffrey MAY, individually; Jean Ross, as natural parent of
Damon Ross, an infant, and Jean Ross, individually; Bonnie
Schorske, as natural parent of Mark Schorske, an infant, and
Bonnie Schorske, individually; Brenda Butler, as natural
parent of Cary Butler, an infant, and Brenda Butler,
individually; Gary Drew, individually
v.
Dr. Saul COOPERMAN, Commissioner of the Department of
Education; New Jersey Department of Education;
Edison Township Board of Education; Old
Bridge Township Board of
Education, Defendants,
Alan J. Karcher as Speaker of the New Jersey General
Assembly; the New Jersey General Assembly; Carmen A.
Orechio as President of the New Jersey Senate; the New
Jersey Senate, Defendant Intervenors.
Appeal of NEW JERSEY COUNCIL OF CHURCHES, New Jersey
Education Association, Alan J. Karcher as Speaker of the New
Jersey General Assembly; the New Jersey General Assembly;
Carmen A. Orechio as President of the New Jersey Senate, the
New Jersey Senate, Defendant Intervenors.
 Nos. 83-5890, 84-5126.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 26, 1984.
Reargued Aug. 13, 1985.
Decided Dec. 24, 1985.
 
 William W. Robertson (argued), Robert P. Zoller, Hannoch, Weisman, Stern, Besser, Berkowitz and Kinney, P.A., Roseland, N.J., Ralph J. Marra, Jr., Robert A. Farkas, Marinari & Farkas, P.A., Trenton, N.J., for appellant.
 Norman L. Cantor, Richard M. Altman, Anne McHugh, Pellettieri, Rabstein and Altman, Trenton, N.J., Jack D. Novik (argued), American Civil Liberties Union, New York, N.Y., for appellees.
 Donald L. Drakeman, Clifton, N.J., for amici curiae N.J. Council of Churches, et al.
 James R. Zazzali, Robert A. Fagella, Zazzali, Zazzali & Kroll, Newark, N.J., of amicus curiae, N.J. Educ. Ass'n.
 David Crump, Houston, Tex., for amicus curiae The Legal Foundation of America, Supporting Reversal.
 Before GIBBONS and BECKER, Circuit Judges and KATZ, District Judge*.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 This appeal by the New Jersey Senate and Assembly as intervening defendants seeks to overturn a declaratory judgment of the district court that N.J.S.A. 18A:36-4 (West 1984-1985) violates the establishment clause of the first amendment. The intervening defendants also appeal from a declaratory judgment that plaintiffs are entitled to counsel fees on the authority of 42 U.S.C. Sec. 1988 (1982). The appeal requires that we assess the impact on the district court's ruling of the subsequent decision of the Supreme Court in Wallace v. Jaffree, --- U.S. ----, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). We affirm the declaratory judgment that the statute is unconstitutional, but dismiss the appeal from the declaratory judgment on fees.
 
 I.
 
 2
 The challenged statute, passed by the New Jersey Legislature over the Governor's veto on December 16, 1983, provides,
 
 
 3
 Principals and teachers in each public elementary and secondary school of each school district in this State shall permit students to observe a 1 minute period of silence to be used solely at the discretion of the individual student, before opening exercises of each school day for quiet and private contemplation or introspection.
 
 
 4
 N.J.S.A. 18A:36-4. Shortly after its passage, on January 10, 1983, several public school pupils, several parents of public school pupils, and one public school teacher filed a verified complaint seeking a declaration that N.J.S.A. 18A:36-4 is unconstitutional, on its face and as applied, and an injunction prohibiting the defendants from implementing it. The named defendants are Saul Cooperman, Commissioner of New Jersey's Department of Education, the Edison Township Board of Education, and the Old Bridge Township Board of Education. Cooperman was joined because he allegedly is charged with implementing, enforcing, and promulgating N.J.S.A. 18A:36-4. See N.J.S.A. 18A:4-23 (West 1968) ("The Commissioner shall have supervision of all schools of the state receiving support or aid from state appropriations...."). The two Boards of Education were joined because the schools operated by them allegedly took steps to implement the statute.
 
 
 5
 On the day the complaint was filed the district court issued a temporary restraining order enjoining the defendants from enforcing N.J.S.A. 18A:36-4. Thereafter it became known that the New Jersey Attorney General, who under New Jersey law would normally be responsible for defending Commissioner Cooperman, would not defend the constitutionality of the Act. On January 14, 1983 the temporary restraining order was modified so as to direct the Commissioner of Education
 
 
 6
 to notify the school districts of the State of New Jersey ... that this Court has made an initial determination that P.L.1982, Ch. 205 [N.J.S.A. 18A:36-4] is unconstitutional and that a temporary restraint has been issued restraining any further enforcement of that provision by defendants and that pursuant to the further Order of this Court the local school districts of the State of New Jersey, their officers, agents, servants, and employees and successors are to immediately cease any further enforcement of P.L.1982, Ch. 205, pending a hearing for a Preliminary Injunction.
 
 
 7
 Joint Appendix 56-57. By the time the January 14, 1983 order had been entered the court was aware that, while the Attorney General would not defend the legislation, the President of the New Jersey Senate, the Speaker of the New Jersey General Assembly, the Senate, and the General Assembly (legislators) sought to intervene for that purpose. Those applicants for intervention consented to the January 14, 1983 modification of the temporary restraining order, although it is not clear why they had any authority to consent to an order purporting to bind nonparty school districts. On January 18, 1983 the legislators' motion to intervene was granted. They and the named defendants on the same day consented to the entry of an order enjoining enforcement of N.J.S.A. 18A:36-4 until the further order of the court.
 
 
 8
 Thereafter the Attorney General filed on behalf of the Commissioner of Education an answer in which he denied that he had implemented, or was charged with the duty of implementing, enforcing, or promulgating N.J.S.A. 18A:36-4. The answer also pleaded that the plaintiffs had not been deprived of any rights, privileges, or immunities secured to them by the United States or the New Jersey Constitutions. Thus the Attorney General's answer appears to put in issue the question whether the Commissioner is an appropriate defendant and also the question whether N.J.S.A. 18A:36-4 is unconstitutional. The Attorney General did not, however, take any further steps in defense of the merits of the complaint.
 
 
 9
 The School District of Old Bridge Township also filed an answer, in which it admitted instituting, pursuant to N.J.S.A. 18A:36-4, the practice of observing a moment of silence. Edison Township School District apparently defaulted. Neither it nor Old Bridge Township School District took any further active role in the litigation.
 
 
 10
 The answer of the intervening legislators, in contrast with that of the Commissioner of Education, admitted that the Commissioner was charged with the duty of implementing, enforcing, and promulgating N.J.S.A. 18A:36-4. The legislators also defended the constitutionality of the legislation through final hearing, which commenced on September 15, 1983. Prior to the final hearing the district court resolved several disputes over discovery, to which further reference is made below.
 
 
 11
 The district court made findings of fact and conclusions of law in support of a final judgment, dated November 10, 1983 "that New Jersey P.L.1982, Ch. 205 is unconstitutional on its face and as applied, and that judgment is granted in favor of the plaintiffs herein." Joint Appendix 272. The final judgment contains no injunction. The preliminary injunction presumably terminated upon the entry of the final judgment. Thus we review only a declaratory judgment.
 
 
 12
 When the declaratory judgment was entered the district court ruled initially that the plaintiffs were not entitled to attorney's fees and costs pursuant to 42 U.S.C. Sec. 1988 (1982). See May v. Cooperman, 572 F.Supp. 1561, 1576 (D.N.J.1983). Thereafter plaintiffs moved for reconsideration of their fee application. On January 26, 1984, 578 F.Supp. 1308, the court ordered that the November 10, 1983 order be amended to award counsel fees and costs as against the legislators intervenors only. Joint Appendix 299. The January 26 order directed plaintiffs' counsel to submit an affidavit of services and costs. Id. The intervening legislators filed a notice of appeal from the January 26, 1984 order, seeking a reversal both of the declaratory judgment that N.J.S.A. 18A:36-4 is unconstitutional and of the declaratory judgment that the plaintiffs are entitled to a fee award. At the time of the notice of appeal, however, the district court had not determined the amount of fees and costs to be awarded.[1]
 
 II.
 
 13
 Because N.J.S.A. 18A:36-4 became law shortly before the public schools of New Jersey recessed for the traditional Christmas holiday, and because its implementation was enjoined pendente lite shortly after that recess ended, there was little available evidence of the actual operation of the Act. The Commissioner of Education took no steps to construe it or in any way to implement it. The two named defendant school districts took certain steps to implement the Act, some of which are discussed hereafter, but neither the New Jersey Department of Education nor the New Jersey courts have addressed the question whether the steps taken by those school districts are consistent with the Act. The Act contains no enforcement mechanism of its own. It may fall within the purview of N.J.S.A. 18A:6-9 (West 1968), which provides, "The Commissioner shall have jurisdiction to hear and determine, without cost to the parties, all controversies and disputes arising under the school laws...." So far as the record discloses, no controversies or disputes over this Act have been presented to the Commissioner.[2]
 
 
 14
 The arid circumstances in which the case was litigated is of some significance because of the rather ambiguous statutory language, which provides,
 
 
 15
 Principals and teachers ... shall permit students to observe a 1 minute period of silence to be used solely at the discretion of the individual student ... for quiet and private contemplation or introspection....
 
 
 16
 N.J.S.A. 18A:36-4. If the Act said "shall not permit students to observe a period of silence," its meaning would be straight forward, and we would probably be discussing a free exercise claim rather than an establishment claim.[3] If the Act said "shall require students to observe a period of silence," its meaning would be equally straightforward, and the focus of the free exercise claim commensurately narrower. The "shall permit" language on its face does not inform us what role the legislature intended for principals and teachers. One possible interpretation is that the legislature intended to compel teachers to require that all pupils engage in a silent moment. Another is that if some pupils desire to remain silent teachers will require that other pupils accommodate their conduct so as not to disturb the silent ones. A third is that teachers should merely permit those pupils desiring to remain silent for a minute at the beginning of the school day to do so, while other pupils go about their business.
 
 
 17
 The district court's opinion appears to proceed on the assumption that the Act should be construed in the first manner; that is, that it directs that all pupils be required to engage in a silent moment.[4] Because the Attorney General did not participate on behalf of the Commissioner of Education, we have no way of knowing how New Jersey education officials at the state level would construe the statute.
 
 
 18
 To some extent, the intervenor legislators lent support to the district court's apparent interpretation that the Act means "shall require" rather than "shall permit." Their defense of the Act suggested that it had the secular purpose of providing a calm transition from nonschool life to school work. Obviously, the calm transition explanation would be plausible only if the minute of silence were mandated for all pupils. The district court rejected this posited secular purpose as an after-the-fact rationalization and a pretext. The court nevertheless assumed that the Act mandated a compulsory moment of silence for all pupils.
 
 
 19
 Our puzzlement over the district court's apparent interpretation of the "shall permit" language is not lessened by a review of previous efforts in New Jersey to deal with the subject of school prayer and moments of silence. Plainly the legislators most interested in the two subjects were quite aware of the difference between a statute requiring student participation in a moment of silence and one merely permitting students desiring to do so to observe such a moment. In 1968, 1969, and 1970 the legislature passed bills that, in contrast with N.J.S.A. 18A:36-4, provided,
 
 
 20
 In each public school classroom, the teacher in charge may, or if so authorized or directed by the board of education by which he is employed, shall, at the opening of the school upon every school day, conduct a brief period of silent prayer or meditation with the participation of all pupils therein assembled.
 
 
 21
 A. 640 (1968) (emphasis supplied): A. 146 (1969); A. 597 (1970). Each of these enactments was vetoed by Governors Hughes and Cahill, who were in office at the respective times of enactment. Governor William Cahill in his veto message returning Assembly Bill No. 597 to the legislature observed, "Insofar as the bill provides for a brief period of meditation, it is unnecessary since there is presently no provision of law which prohibits individual teachers or school authorities from holding moments of silence in the classroom." Some school districts, the evidence discloses, did in fact hold moments of silence in the classroom before the vetoed bills were passed.[5]
 
 
 22
 Despite vetoes by two successive governors, a bill identical to that quoted above was pre-filed in the 1972 legislative session. A. 133 (1972). In 1974 a bill was introduced that initially substituted the word "may" for "shall" conduct, which apparently would have made the exercise optional with teachers, but not with pupils. A. 373 (1974). It was amended in committee to restore the word "shall". Assembly Committee Amendments to A. 373. In 1976 a bill identical to that vetoed by Governors Hughes and Cahill was pre-filed. A. 648 (1976). That same year another bill was introduced similar in language to Assembly Bill No. 648, except that it provided that if the local school district authorizes it a teacher "may" rather than "shall" conduct a moment of silence. A. 2159 (1976). Assembly Bill No. 648 was amended in committee to read, "In each public school classroom, the teacher shall at the opening of school upon every school day, conduct a period of silent meditation with the participation of all the pupils therein assembled." Thus as amended, the 1976 version of Assembly Bill No. 648 would have removed any local school board option and made mandatory the participation of all pupils in a moment of silence. The statement of the Assembly Education Committee to Assembly Bill No. 648 indicates that the amended version was modeled upon Mass.Gen.Laws Ann., Ch. 71, Sec. 1A (West 1982) which was held to be constitutional in Gaines v. Anderson, 421 F.Supp. 337 (D.Mass.1976) (three judge district court). The Gaines v. Anderson court reasoned that when Massachusetts legislature struck the word "prayer" from the bill that became law and substituted the word "meditation," it "demonstrated awareness of the distinction between these two words and an intention to further secular purposes without infringing the values protected by the Establishment Clause." Id. at 342. The Massachusetts law is mandatory, and the Assembly Committee's reference to it presumably conveys the intention of accomplishing a mandatory silent moment that would be recognized as having a secular purpose. The legislature's awareness of the distinction between mandatory and permissive legislation on the subject in issue is confirmed by the Report of the Senate Education Committee on Assembly Bill No. 648 and Senate Bill No. 3042. The report notes, "Assembly Bill No. 648 is a modification of proposals introduced in previous sessions and requires rather than permits a brief period of silent meditation. Senate Bill No. 3024 would make it optional with the local districts." The report refers to similar legislation in Connecticut, Public Act No. 74-367, Sec. 2, Pennsylvania, 24 P.S. Sec. 15-1516.1, and Massachusetts, Mass.Gen.Laws Ann., Ch. 71 Sec. 1A. Bill No. 648 as amended was passed, but vetoed by Governor Byrne.
 
 
 23
 Bills that would make pupil participation mandatory were introduced in subsequent legislatures. E.g. A. 1028 (1980) (local option); A.342 (1980) (all school districts); A.2197 (1981) (local option; amended by Senate to require moment of silence in all school districts. Assembly Bill 2197 was passed but it, too, was vetoed).
 
 
 24
 After 1976 the moment of silence bills all omitted specific reference to prayer. The Bill that became law in 1982 also omitted any specific reference to prayer. In Assembly Bill No. 1064, introduced on March 8, 1982, however, the supporters of a moment of silence changed their proposal significantly. The caption and enacting clause read,
 
 
 25
 An Act to allow students of public schools to participate in a 1 minute period of silence before the opening of each school day and supplementing Chapter 36 of Title 18A of the New Jersey Statutes.
 
 
 26
 Be it enacted by the Senate and General Assembly of the State of New Jersey :
 
 
 27
 1. Principals and teachers in each public elementary and secondary school district in this state shall permit students to observe a 1 minute period of silence to be used solely at the discretion of the individual student, before the opening exercises of each school day for quiet and private contemplation or introspection.
 
 
 28
 2. This Act shall take effect immediately.
 
 
 29
 A. 1064 (1982) (emphasis supplied). This Bill was referred to the Senate and Assembly Education Committees, which filed identical reports as follows:
 
 
 30
 Assembly Bill No. 1064 requires all principals and teachers in the public elementary and secondary schools of New Jersey to permit students to observe one minute of silence before the opening exercises of each school day. The bill provides that the one minute of silence is to be used solely at the discretion of the individual student for quiet contemplation or introspection.
 
 
 31
 A statute similar to that proposed in Assembly Bill No. 1064 was enacted in Massachusetts and has been upheld by the United States District Court of Massachusetts. (Civil Action No. 76-435-M, September 1, 1976).
 
 
 32
 Statements of Senate and Assembly Education Committees to A. 1064. This Bill is consistent with prior legislative efforts to eliminate the local school district option. It is inconsistent with prior legislative efforts, in that all prior moment of silence proposals mandated the participation of all students.
 
 
 33
 The New Jersey Legislature does not preserve a transcription of its committee hearings or floor debates. Several witnesses who attended hearings of the Senate or house Education Committee and floor discussion on the Bill testified about what transpired in those proceedings. None of these witnesses referred to anything that took place during the proceedings that would lend support to a reading of the proposed law as mandating student participation.[6] Indeed the only relevant remark to which any witness referred was Marianne Rhode's quotation of Senator Ewing: "Why shouldn't this be allowed? Why not give students the opportunity?" Trial transcript, Sept. 14, 1983, p. 231. There is, so far as we have been able to discover, no other legislative history bearing on the proper interpretation of N.J.S.A. 18A:36-4.
 
 
 34
 Given the legislature's fairly clear understanding of the difference between legislation mandating a certain action and legislation permitting it, the statement of purpose in Assembly Bill 1064, the wording of the Education Committee reports on that Bill, and the absence of any legislative history suggesting that the Bill means other than what it says, we conclude that the challenged law is, insofar as student participation is concerned, permissive only.
 
 
 35
 Although our reading of N.J.S.A. 18A:36-4 is significant in determining the validity of the Act, it does not change the nature of constitutional analysis to be applied. Viewing N.J.S.A. 18A:36-4 as an accommodation statute broadens the issue, but because the state legislators chose to act the statute must still be evaluated as an establishment clause case, and not a free exercise statute. See Thornton v. Caldor, Inc., --- U.S. ----, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985) (analyzing a state statute that provided private sector employees with the right not to work on their Sabbath under the establishment clause). Thus the issue presented by this appeal is whether a state may direct school principals and teachers to permit pupils desiring to do so to observe a moment of silence at the beginning of the school day.
 
 III.
 
 36
 The Supreme Court has conceded that the principles embodied in the establishment clause of the first amendment have proven difficult to apply. See Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 1370, 79 L.Ed.2d 604 (1984) (Brennan, J., dissenting). Faced with this difficult application, the Court has sought guidance by analyzing establishment clause cases under the three-part disjunctive test announced in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). In Lemon the Court stated, "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.' " Id. at 612-13, 91 S.Ct. at 2111 (citations omitted). Although this test has been questioned by certain members of the Court, see Wallace v. Jaffree, 105 S.Ct. at 2497 (O'Connor, J., concurring), in the Court's most recent establishment clause case, a clear majority endorsed the Lemon test as the rubric under which a challenged governmental practice will be judged. See Wallace v. Jaffree, 105 S.Ct. at 2489; see also Lynch v. Donnelly, 104 S.Ct. at 1362.
 
 
 37
 The district court, applying the three-part disjunctive test of Lemon v. Kurtzman, concluded that the law failed in each respect. According to the district court, the law was enacted for a religious rather than a secular purpose, had the effect both of advancing and of inhibiting religion, and fostered excessive government entanglement with religion. Because we disagree with the district court's analysis in some respects, it is convenient to reverse the usual order of discussion of the Lemon v. Kurtzman standards.
 
 A.
 Entanglement
 
 38
 Supporting its conclusion that the law would foster an excessive entanglement with religion, the district court reasoned,
 
 
 39
 Implementation of the Bill would not involve the State in the kind of continued and pervasive monitoring of sectarian activities which were condemned in Lemon v. Kurtzman, supra. It would, however, tend to promote divisiveness among and between religious groups, another form of entanglement. Gilfillan v. City of Philadelphia [637 F.2d 924] 932 [ (3d Cir.1980) ]. A required moment of silence would pit children and parents who believe in prayer against children and parents who do not.
 
 
 40
 May v. Cooperman, 572 F.Supp. at 1575.
 
 
 41
 We do not find this reasoning persuasive. In the first place, as noted in Part I, we are not dealing with a "required" moment of silence, if by "required" is meant an exercise in which all pupils are required to participate. Moreover, the Supreme Court has never held that the potential for political disagreement over government action accommodating religious beliefs is sufficient to trigger the application of the excessive entanglement test. Indeed in Lynch v. Donnelly the Court expressly stated "that this Court has not held that political divisiveness alone can serve to invalidate otherwise permissible conduct." 104 S.Ct. at 1364. See also Mueller v. Allen, 463 U.S. 388, 404 n. 11, 103 S.Ct. 3062, 3071 n. 11, 77 L.Ed.2d 721 (1983) (reference to political divisiveness in Lemon v. Kurtzman confined to cases where direct financial subsidies are paid to parochial schools or to teachers in parochial schools). No doubt any accommodation made by government to the free exercise of religion by believers is politically divisive in the sense that it offends those who believe that such accommodation is an unwarranted toleration. If political divisiveness were the test for entanglement, no governmental accommodation of religion would survive establishment scrutiny. The law is otherwise. See, e.g., Mueller v. Allen, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983); Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (tax exemption of Church property does not violate establishment clause).
 
 B.
 Primary Effect
 
 42
 Supporting its conclusion that the primary effect of N.J.S.A. 18A:36-4 is to advance and to inhibit religion, the district court reasoned.
 
 
 43
 [T]he State has injected itself into religious matters by designating a time and place when children and teachers may pray if they do so in a particular manner and by mandating conduct by all other children and teachers so that the prayers may proceed uninterrupted in their presence.
 
 
 44
 While this form of legislation advances the religion of some, it inhibits the religion of others in at least two ways
 
 
 45
 First, there are those whose religious practices include silent prayer and meditation but who, as an article of faith, believe that the State should have no part in religious matters. For them mandated prayer is no longer prayer.... Thus the State, seeking to further religion by mandating certain religious observances, in fact weakens religion by draining vitality from these observances.
 
 
 46
 * * *
 
 
 47
 Second, by mandating a minute of silence which permits some persons from engaging in prayer, Bill 1064 prevents other persons from engaging in their kind of prayer.... Bill 1064, therefore, mandates an environment which allows some to pray but prevents others from engaging in their form of prayer.
 
 
 48
 Finally there are those who profess no religion and to whom any form of prayer is offensive. Bill 1064 requires these persons to assume a posture suggestive of particular forms of prayer which are responsive to particular beliefs about ultimate reality.
 
 
 49
 May v. Cooperman, 572 F.Supp. at 1574-75.
 
 
 50
 While the district court's analysis of the effects aspect of the Lemon v. Kurtzman test presents us with a closer issue than the court's entanglement analysis, we find it flawed as well.
 
 
 51
 Relying on the testimony of witnesses with theological training, the court found as a fact that "A short period of group silence at the commencement of the day or at the commencement of an undertaking constitutes one of the traditional forms of prayer of major religious bodies in New Jersey." Id. at 1571 (footnote omitted). This finding is not clearly erroneous. Thus for our analysis of the effects issue we will assume that silence is for many pupils the equivalent of prayer. It does not follow, however, that for all pupils that is the case. Moreover, the district court's reasoning seems to be predicated upon an interpretation of the statute as mandating student participation; an interpretation that we have rejected.
 
 
 52
 The district court's observation that by mandating a minute of silence the legislation "prevents other persons from engaging in their kind of prayer ..." is a non sequitur. The statute simply does not address the problem of accommodating the beliefs of those whose prayer must be oral or otherwise self expressive. Undoubtedly the school environment requires limitation upon the time, place, and manner of such self expression, even when it is religiously motivated. It is, however, the compulsory school attendance law, not N.J.S.A. 18A:36-4, that "prevents other persons from engaging in their kind of prayer." The challenged statute is a limited exception to the general school regulations, which for educational purposes impose in schools a structured environment in which even religiously-motivated students are required to do the school's thing, and not their own.
 
 
 53
 That is not to suggest that the practice of observing a moment of silence has no effect upon those pupils who decline to participate in it or those teachers who must permit it. To put the matter in concrete terms, we look at the evidence presented on behalf of Jeffrey May, a plaintiff. May, a high school teacher in the Edison Township school system, and an agnostic, was informed by his school principal that he had to comply with the statute. The principal wrote,
 
 
 54
 The interpretation of [N.J.S.A. 18A:36-4] for our school is as follows. We will observe one minute of seated silence in each homeroom at the very beginning of the opening exercises.
 
 
 55
 You will note that the Bill says students shall be permitted to observe a minute of silence. That will be interpreted to mean that there will be a minute of silence in the classroom so that each student may use that time as the individual interprets his or her desire to do so. This means that there will be no talking and no movement about the room. Each student will remain seated in his or her seat during the one minute period. At the conclusion of the one minute, students will be asked to rise and participate in the Pledge, and the remainder of the homeroom procedure will continue as in the past.
 
 
 56
 Exhibit C to Complaint. May refused to implement N.J.S.A. 18A:36-4 and was cited for insubordination. Exhibit C to Complaint. Before any administrative proceedings took place on that charge, he filed this action.
 
 
 57
 The principal's letter demonstrates the manner in which N.J.S.A. 18A:36-4 may impact upon nonbelieving or otherwise objecting teachers and pupils. His reference in the last quoted sentence to the Pledge is to the exercise mandated in New Jersey by N.J.S.A. 18A:36-3(c) (West 1968).[7] That statute requires the recitation of a pledge of allegiance to the flag, but excuses from that recitation pupils who have conscientious scruples against it. Such pupils are nevertheless required "to show full respect to the flag while the pledge is being given merely by standing at attention...." In Lipp v. Morris, 579 F.2d 834 (3d Cir.1978), we considered a challenge to the constitutionality of the pledge statute by a pupil who objected to the requirement that she engage in symbolic speech by standing at attention. We held that the requirement that she stand at attention violated her first amendment rights, but that this requirement was severable from the remainder of the statute. Significantly, however, we did not prohibit the exercise because it had the incidental effect of requiring the objecting pupil to remain in her seat and refrain from interrupting the observance of the exercise by others. So, too, with the minute of silence. Compliance with N.J.S.A. 18A:36-4, by permitting willing students to engage in that observance, has the inevitable effect of requiring that other students refrain from interrupting that exercise. The teacher in charge is also required, as a practical matter, to prevent such interruption. If the moment of silence is to be permitted for some, school discipline must in the meantime be maintained for others. Unquestionably the maintenance of such discipline prevents the others from engaging in their own oral or self-expressive conduct. We hold, however, that a restriction of this kind is valid as a legitimate time, place, and manner regulation. See, e.g., Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37, 45-46, 103 S.Ct. 948, 954-55, 74 L.Ed.2d 794 (1983); Heffron v. International Society for Krishna Consciousness Inc., 452 U.S. 640, 648-52, 101 S.Ct. 2559, 2564-66, 69 L.Ed.2d 298 (1981); United States Postal Service v. Council of Greenburgh Civil Assns., 453 U.S. 114, 132, 101 S.Ct. 2676, 2686, 69 L.Ed.2d 517 (1981). We do not hold that the requirements suggested in the principal's letter, that the pupils in homeroom classes remain seated, is the only possible accommodation to the views of nonparticipants. That would depend, we think, upon the structure of each district's educational program. In some districts it may be possible that nonparticipating pupils leave the classroom during the exercise. But the record in this case is simply too incomplete to adjudicate what time, place, and manner accommodations are required.
 
 
 58
 The district court's observation that the state has injected itself into religious matters by designating a time and place when children and teachers may pray does not in our view satisfy the effects test. The state equally injects itself into religious matters when it designates a time and place when children and teachers may not pray. As we observed with respect to the effect on persons whose prayer takes more expressive forms, some form of time, place, and manner restraint is necessary for the accomplishment of a school's educational mission. So, too, if accommodation to the preferences of those who wish to pray silently is to be made at all, the state must be free to designate when, during the school day, such accommodation shall take place. We conclude, therefore, that the district court erred in finding that the primary effect of the challenged statute is both to advance and to inhibit religion.
 
 C.
 Purpose
 
 59
 The most difficult aspect of the instant case is presented by the legislative purpose feature of the Lemon v. Kurtzman formulation. This difficulty is compounded by the Supreme Court's intervening decision in Wallace v. Jaffree, --- U.S. ----, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). In that case the Court struck down an Alabama statute authorizing a moment of silence at the beginning of each school day because the statute lacked a secular purpose. 105 S.Ct. at 2490. Specifically, the Alabama statute provided.
 
 
 60
 At the commencement of the first class of each day in all grades in all public schools the teacher in charge of the room in which the class is held may announce that a period of silence not to exceed one minute in duration shall be observed for meditation or voluntary prayer and during any such period no other activities shall be engaged in.
 
 
 61
 Alabama Code Sec. 16-1-20.1 (Supp.1984) (emphasis supplied). In contrast to N.J.S.A. 18A:36-4, this Alabama statute appears to be optional for teachers, but mandatory for students. It also specifically mentions voluntary prayer. The Supreme Court held that it violated the purpose test of Lemon v. Kurtzman because the sole purpose behind its enactment was the endorsement or approval of religion. Wallace v. Jaffree, 105 S.Ct. at 2490. In reaching that conclusion the court relied on the testimony of Senator Donald G. Holmes, the prime sponsor of the legislation, that his sole purpose was to reintroduce voluntary prayer in public schools. Id. at 2483.
 
 
 62
 Although the Supreme Court's decision in Wallace v. Jaffree was limited to a determination of the constitutionality of one Alabama statute, in its analysis the Court contrasted and discussed two other Alabama statutes. One of these statutes authorized teachers to lead "willing students" in a designated prayer. Alabama Code Sec. 16-1-20.2 (Supp.1984). In an earlier opinion the Court had summarily affirmed the judgment of the Court of Appeals for the Eleventh Circuit holding this statute to be unconstitutional. See Wallace v. Jaffree, 466 U.S. 924, 104 S.Ct. 1704, 80 L.Ed.2d 178 aff'g, 705 F.2d 1526 (11th Cir.1983).
 
 
 63
 Another Alabama statute discussed in Wallace v. Jaffree provides,
 
 
 64
 At the commencement of the first class each day in the first through sixth grades in all public schools, the teacher in charge of the room in which each such class is held shall announce that a period of silence, not to exceed one minute in duration, shall be observed for meditation, and during any such period silence shall be maintained and no activities shall be engaged in.
 
 
 65
 Alabama Code Sec. 16-1-20 (Supp.1984). In contrast with N.J.S.A. 18A:36-4, this Alabama statute appears to be mandatory both for teachers and for pupils. Like the New Jersey statute, however, section 16-1-20 omits any specific reference to prayer. The plaintiff in the Jaffree case initially challenged the constitutionality of section 16-1-20. At the preliminary injunction stage the district court in Alabama held that it was valid. Jaffree By ex rel, Jaffree v. James, 544 F.Supp. 727, 732 (S.D.Ala.1982). By the time the case reached the Supreme Court the plaintiff had abandoned any claim that section 16-1-20 was unconstitutional. Wallace v. Jaffree, 105 S.Ct. at 2481. Thus, technically the Supreme Court did not address the constitutionality of section 16-1-20. In justifying the holding that section 16-1-20.1 was unconstitutional, however, Justice Stevens in the opinion of the Court observed,
 
 
 66
 The legislative intent to return prayer to the public schools is, of course, quite different from merely protecting every student's right to engage in voluntary prayer during an appropriate moment of silence during the school day. The 1978 statute already protected that right, containing nothing that prevented any student from engaging in voluntary prayer during a silent minute of meditation. Appellants have not identified any secular purpose that was not fully served by Sec. 16-1-20 before the enactment of Sec. 16-1-20.1.
 
 
 67
 * * *
 
 
 68
 The Legislature enacted Sec. 16-1-20.1 despite the existence of Sec. 16-1-20 for the sole purpose of expressing the State's endorsement of prayer activities for one minute at the beginning of each day. The addition of "or voluntary prayer" indicates that the State intended to characterize prayer as a favored practice.
 
 
 69
 105 S.Ct. at 2491-92 (footnote omitted). Justice O'Connor, concurring, noted that "[b]y mandating a moment of silence, a State does not necessarily endorse any activity that might occur during that period." Id. at 2499 (O'Connor, J., concurring). Justice Powell, concurring, observed, "I agree fully with Justice O'CONNOR's assertion that some moment-of-silence statutes may be constitutional, a suggestion set forth in the Court's opinion as well." Id. at 2493 (Powell, J., concurring) (footnote omitted). Justice White, dissenting stated that
 
 
 70
 [I]n my view the First Amendment does not proscribe either (1) statutes authorizing or requiring in so many words a moment of silence before classes begin or (2) a statute that provides, when it is initially passed, for a moment of silence for meditation or prayer. As I read the filed opinions, a majority of the Court would approve statutes that provided for a moment of silence but did not mention prayer.
 
 
 71
 Id. at 2508 (White, J., dissenting). Neither Justice Burger nor Justice Rehnquist, who filed separate dissenting opinions, expressed any disagreement with Justice White's appraisal of the status of moment-of-silence legislation.
 
 
 72
 It is clear, therefore, that in the abstract a statute such as N.J.S.A. 18A:36-4 would not, in the opinion of the Supreme Court, be deemed invalid under the purpose leg of Lemon v. Kurtzman. But unlike Wallace v. Jaffree the moment of silence statute is not before us in the abstract. The plaintiffs continue to challenge it. They have made a record in support of that challenge, and the district court has made findings as to the legislative purpose. Thus it seems appropriate to take account of Justice O'Connor's observation that "[t]he face of the statute or its legislative history may clearly establish that it seeks to encourage or promote voluntary prayer over other alternatives, rather than merely provide a quiet moment that may be dedicated to prayer by those so inclined." Id. at 2499 (O'Connor, J., concurring).
 
 
 73
 In this case the district court found that the statute, although facially neutral, had a religious and not a secular purpose. The court did not find that teachers had encouraged voluntary prayer over other alternative uses of the minute of silence.[8] The finding addressed the purpose of the legislature, not of teachers. In reaching that conclusion the district court relied heavily upon evidence suggesting that the silent minute has no legitimate pedagogical value. The legislators' tendered secular purpose--to provide a transition from nonschool life to school life--was rejected as pretextual. May v. Cooperman, 572 F.Supp. at 1571. Having rejected the one secular purpose tendered by the intervening defendants, the court noted the history in the New Jersey legislature of other less facially neutral efforts to return prayer to the public schools; in particular the previous activities of one sponsor of the instant legislation.
 
 
 74
 Because we cannot say that this finding by the district court is clearly erroneous,[9] see Fed.R.Civ.P. 52(a), we accept the trial court's finding that the legislature's purpose in enacting N.J.S.A. 18A:36-4 was religious, at least to the extent of requiring school districts to accommodate those students desiring the opportunity to engage in prayer at some point during the school day. That, however, is only the beginning of the inquiry. The district court's rejection of the tendered transitional moment secular purpose as pretextual does not compel the conclusion that the state seeks, in Justice O'Connor's words "to encourage voluntary prayer over other alternatives." A purpose of accommodating the religious beliefs of some students is itself a religious purpose, in the sense that absent such beliefs there would have been no reason for the accommodating state action. Given the language of the New Jersey statute which, unlike section 16-1-20 of the Alabama statute, is permissive for students, and the record evidence, we do not believe a finding that the religious purpose was to encourage prayer over other alternatives, rather than to accommodate those wishing to pray, would be sustainable.
 
 
 75
 Thus the question presented by this appeal narrows to this: May the state, acting through the legislature or through a school board or through an individual teacher, take action in the school setting that, while not endorsing prayer in preference to other forms of silent activity, provides for a minute of silence for the purpose of permitting prayer by those who want to pray. We do not find any clear answer in Wallace v. Jaffree. Nevertheless, while there was no finding in Wallace v. Jaffree that the Alabama statute was enacted for the purpose of accommodating prayer, there is also no indication that the secular purpose requirement of the Lemon v. Kurtzman test turns on the mandatory as opposed to permissive nature of a statute. Indeed, in contrasting different Alabama statutes, the Court specifically noted that while earlier statutes were mandatory for teachers the statute it was considering was permissive. This distinction, however, was of no relevance to the Court's constitutional analysis. See Wallace v. Jaffree, 105 S.Ct. at 2491. Moreover, in the recent case of Thornton v. Caldor, Inc., --- U.S. ----, 105 S.Ct. 2914, 2917, 86 L.Ed.2d 557 (1985), the Court applied the Lemon v. Kurtzman test to strike down a Connecticut statute that was designed to accommodate religious views.[10] Accordingly, because the Supreme Court has expressly required a secular purpose when considering a constitutional challenge under the establishment clause and because the district court made a finding that N.J.S.A. 18A:36-4 lacked such a secular purpose, we hold the New Jersey statute to be unconstitutional under the first amendment.
 
 IV.
 
 76
 The legislators also appeal from the district court's declaratory judgment that fees may be assessed against them. Since, however, no amount of fees had been fixed, that declaratory judgment is interlocutory. See Bandai America Inc. v. Bally Midway Mfg. Co., 775 F.2d 70 (3d Cir.1985)); West v. Keve, 721 F.2d 91, 94-97 (3d Cir.1983); DeLong Corp. v. Raymond International Inc., 622 F.2d 1135, 1138-39 (3d Cir.1980). Although the district court subsequently fixed a fee amount, the legislators appealed from the declaratory judgment and not the subsequent judgment awarding an actual fee amount. Thus that appeal must be dismissed.
 
 V.
 
 77
 The declaratory judgment that N.J.S.A. 18A:36-4 is unconstitutional will be affirmed. The appeal from the declaratory judgment that the legislators are liable for attorneys fees will be dismissed.
 
 
 78
 BECKER, Circuit Judge, dissenting.
 
 
 79
 The district court held that the New Jersey minute of silence statute, New Jersey P.L. 1982 Ch. 205, was unconstitutional because it violated all of the elements of the three-part disjunctive test set forth in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971): (1) it did not have a secular purpose, (2) its primary effect both advanced and inhibited religion, and (3) it fostered excessive governmental entanglement with religion by promoting divisiveness among religious groups. 572 F.Supp. 1561, 1572-76 (D.N.J.1984). A majority of this panel disagrees with the district court on the second and third points: it finds neither impermissible effect nor excessive entanglement. Majority Op. at 246. With these conclusions I have no quarrel.
 
 
 80
 Although the majority agrees with the district court that the animating legislative purpose is religious, it reaches this conclusion by an analysis different from that relied upon by the district court. Unlike the district court, the majority interprets the statute to permit, rather than to mandate, student prayer. This reading I believe to be correct. Because of the permissive nature of the statute, the majority concludes that the legislative purpose was not to encourage prayer over other activities, but to accommodate those students who wish to pray in school. Its decision thus turns on the requirement of that the legislature have a secular purpose even when it accommodates religion. The majority holds this accommodation unconstitutional because it accepts the district court's finding that the statute lacks a secular purpose. I respectfully dissent from this holding.
 
 
 81
 In my view, a permissive and facially neutral statute such as this is presumptively constitutional. This view is supported not only by common sense, but also by statements in Zorach v. Clausen, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), and in several of the opinions in Wallace v. Jaffree, --- U.S. ----, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). I also believe that the presumption becomes a strong one where, as here, the panel has concluded that the statute has no impermissible effect and fosters no excessive governmental entanglement with religion. As I see it, under these circumstances, only extremely clear proof that the law is devoid of a secular purpose would justify our holding it unconstitutional; such proof was not produced in this case.
 
 
 82
 Second, I believe that the majority applied an incorrect standard of review when it deferred to the findings of the district court. Bose Corp. v. Consumers Union, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), dictates that our review in this first amendment case be plenary. Under a plenary review standard, after analyzing the evidence of purpose adduced at trial (and bearing in mind the permissive nature of the statute), I conclude that the statute has a legitimate secular purpose, hence is not infirm. Finally, even under a deferential standard of review, I would not accept the district court's purpose finding because it is unsupported by the admissible evidence. Accordingly I would reverse the judgment of the district court.
 
 
 83
 In the ordinary course I would commence my discussion with these grounds for reversal. Here, however, in light of what I believe to be the flawed accommodation analysis that informs the majority's position, I shall discuss the accommodation issue first. Unlike the majority, I do not believe that a statute accommodates religion when it lifts no pre-existing impediment to religious exercise and when, in fact, it creates the alleged religious practice in question. The majority, in the exercise of describing the minute of silence statute as religious, has mistaken the permissive nature of the enactment for an active accommodation of religion. I engage in this discussion of accommodation because this defect is central to the majority's argument, because it emphasizes the unlikelihood that this statute is unconstitutional, and because it is important to identify the confusion in the jurisprudence about the concept of accommodation. As a preface to this accommodation discussion--and to the opinion itself--I shall explain in a fashion somewhat different from that employed by the majority, why the statute is permissive.
 
 I. NATURE OF THE STATUTE
 A. The Permissive Nature of the Statute
 The statute provides:
 
 84
 Principals and teachers ... shall permit students to observe a 1 minute period of silence to be used at the discretion of the individual student, ... for quiet and private contemplation or introspection....
 
 
 85
 It is apparent from the face of the statute that the only mandatory word, "shall," is directed at principals and teachers. The language applicable to students is, by contrast, permissive: the minute is to be used "at the discretion of the individual student." Presumably, this language means that students may read, or listen through earphones to radios or tape cassettes, or be excused from class during the minute of silence. As the majority's review demonstrates, see Majority Op. at 246, prior drafts of the minute of silence statute and the legislative history of this version fully support the conclusion that, insofar as student participation is concerned, the law is permissive only.[1]
 
 
 86
 Of course, students who are so disposed may engage in silent prayer during the minute of silence. But this activity occurs only because the statute allows the students to use the minute of silence at their discretion; the statute neither requires nor encourages prayer. The statute refers to "quiet and private contemplation or introspection." While these activities may outwardly resemble prayer, they frequently involve quite different attitudes of mind. "Prayer," and "private contemplation or introspection," are not synonymous.
 
 
 87
 Like the majority, therefore, I interpret the statute as permitting, but not coercing, prayer. The majority proceeds to characterize this permissive law as a governmental accommodation of religion. I have strong reservations about the majority's accommodation analysis.
 
 
 88
 B. Accommodation of Religion?
 
 
 89
 The majority reasons that by providing a minute of silence at the beginning of the school day, the government accommodates those students who wish to pray. Because of the neutrality of the statute and the absence of any pre-existing governmental impediment to silent prayer in schools, I disagree with the interpretation of the statute as an accommodation of religion. Moreover, I have doubts as to whether a statute that creates the purported religious observance can be viewed as an accommodation of religion. While I do not accept the majority's accommodation analysis, the concept of accommodation is murky enough that I admit that the majority's approach may be correct. As I have explained, see supra at p. 254, it is important for several reasons to clarify the problems with the majority's accommodation analysis, not the least of which is that the majority's resort to the unclear concept of accommodation suggests that this statute is not religious at all, and how unlikely it is that it is unconstitutional.
 
 
 90
 Government accommodation of religion, as opposed to mere tolerance, has been approved by the Supreme Court, at least where there is some secular purpose of the governmental practice. See Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 1359, 79 L.Ed.2d 604 (1984). While its contours are not entirely clear, an accommodation seems to consist of the lifting of a barrier to religious observance. Thus, without a release time program, public school attendance requirements would interfere with religious instruction classes. See Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952). In his opinion of the Court in Wallace v. Jaffree, --- U.S.----, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), Justice Stevens recognized that a burden on religious exercise exists prior to a government accommodation of religion. He pointed out that at the time of enactment of the Alabama statute under consideration, "there was no governmental practice impeding students from silently praying for one minute at the beginning of each school day; thus, there was no need to 'accommodate' or to exempt individuals from any general governmental requirement because of the dictates of our cases interpreting the Free Exercise Clause." Id., 105 S.Ct. at 2491 n. 45.
 
 
 91
 In her opinion in Wallace, supra, Justice O'Connor also described accommodation as a lifting of a governmental impediment to religious practice. 105 S.Ct. at 2505. She concluded that "the Alabama statute at issue today lifts no state-imposed burden on the free exercise of religion, and accordingly cannot properly be viewed as an accommodation statute." Id. Similarly, prior to the enactment of the New Jersey minute of silence statute, there was "no governmental practice of impeding students from silently praying for one minute at the beginning of each school day." Under the analysis of two Justices in Wallace, supra, therefore, the statute cannot be considered an accommodation.
 
 
 92
 Moreover, I doubt that accommodation analysis is appropriate when the religious interest in question is created by the very statute that accommodates it. Until the adoption of the minute of silence statute, there was no formally established quiet time during which students in public schools could pray. Thus, the allegedly offending practice--praying during silent time at school--was created by the statute. When it concludes that the statute is a governmental accommodation of religion, the majority engages in bootstrapping. The minute of silence statute does not allow for the observance of a pre-existing religious interest, as did, for example, the release time program for religious training approved in Zorach. And, if the statute provides for any religious activity at all, it provides for a new religious activity; hence, it cannot be said to accommodate an existing one.
 
 
 93
 There is a potential flaw in the foregoing analysis, one stemming from Lynch, supra. It is possible to read Lynch as approving the use of accommodation analysis where the religious interest is created by the statute or governmental practice in question and where there was no pre-existing burden to religious observance. The Court in Lynch treated Pawtucket's practice of displaying a nativity scene as an accommodation of religion even though the challenged governmental practice arguably created the religious interest it accommodated, i.e., the interest in viewing the nativity scene. Looking at the problem differently, one might say what was accommodated was not the specific interest created by the government, but rather the more general American religious heritage. Under either interpretation of Lynch, the minute of silence statute can be viewed as an accommodation of religion.
 
 
 94
 Moreover, it is not clear that the nativity display challenged in Lynch removed a pre-existing impediment to religious exercise. In fact, if the religious interest that the Pawtucket display accommodated was created by the display itself, there could have been no pre-existing impediment to religious exercise because there was no exercise to impede. Had the municipality not erected a nativity scene, there would have been no governmental impediment to citizens setting up their own creches, although these nativity scenes would require some expenditure of money by individual citizens. More to the point, the Lynch Court never considered the existence of any impediment to religious observance in the absence of the municipal nativity scene.[2]
 
 
 95
 Despite Lynch, which is, after all a very different kind of case, I am skeptical about the majority's characterization of the statute as an accommodation of religion. I believe that my colleagues confuse the permissive nature of the statute with an active accommodation of religious activity. Because the statute is permissive and facially neutral, the majority understandably has difficulty ascribing a religious nature to it. The only way it can do so, it seems, is by considering the law an accommodation of religion (although, ironically, accommodations of religion have been held constitutional by the Supreme Court). The problems with the majority's accommodation analysis emphasize the need for clarification of this area by the Supreme Court. Moreover, the fact that the majority was forced to turn to accommodation in order to ascribe a religious nature to a permissive, facially neutral statute emphasizes how unlikely it is that such a statute is unconstitutional.
 
 C. The Presumption of Constitutionality
 
 96
 As we have seen, the statute is permissive and facially neutral, i.e., it makes no mention of religion. In my view, such a statute is presumptively constitutional.[3] When the state has neither given support to a religious group nor enforced any religious observance, it can hardly be said to have established a religion. As I see it, only very strong proof of excessive entanglement, of impermissible effects, or of the absence of any secular purpose will serve to invalidate such a statute.[4] Statements in Zorach, supra, and Wallace, supra, underscore the unlikelihood that such a statute will be unconstitutional.
 
 
 97
 In Zorach, the absence of governmental coercion indicated to the Supreme Court that a school that released students during the day for religous study violated neither the Establishment nor the Free Exercise clauses. The Court's reasoning was clear, and its holding unequivocal:
 
 
 98
 No one is forced to go to the religious classroom and no religious exercise or instruction is brought to the classrooms of the public schools. A student need not take religious instruction, he is left to his own desires as to the manner or time of his religious devotions, if any.
 
 
 99
 There is a suggestion that the system involves the use of coercion to get public school students into religious classrooms. There is no evidence on the record before us that supports that conclusion. The present record indeed tells us that the school authorities are neutral in this regard and do no more than release students whose parents so request. If in fact coercion were used, it it were established that any one or more teachers were using their office to persuade or force students to take the religious instruction, a wholly different case would be presented.
 
 
 100
 343 U.S. at 311, 72 S.Ct. at 682 (footnotes omitted). The lesson of Zorach, then, is that so long as authorities do not force students to participate, the authorities may allow and provide time and room for voluntary religious participation.
 
 
 101
 The Zorach reasoning applies directly to the statute at issue here. No student is forced to observe a minute of contemplation, much less prayer. Each student is left to his or her own desires as to how to use that time, and the state is neutral. The statute does no more than provide students who wish to pray silently with an opportunity to do so undisturbed by noise.
 
 
 102
 At least one other case supports the proposition that moment of silence statutes that are permissive and facially neutral presumptively have a secular purpose. In Abington School District v. Schempp, 374 U.S. 203, 281, 83 S.Ct. 1560, 1602, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring), Justice Brennan said that "the observance of a moment of reverent silence at the opening of the class [may serve] the solely secular purposes of devotional activities without jeopardizing either the religious liberties of any members of the community or the proper degree of separation between the spheres of religion and government." (quoted in Wallace, supra, 105 S.Ct. at 2499 (O'Connor, J., concurring)).
 
 
 103
 The vitality of such reasoning has recently been reaffirmed in Wallace, which, like the instant case, involved a moment of silence statute. The statute at issue in Wallace gave each teacher the discretion to announce a period of silence in her or his classroom; however, if the teacher did impose the minute of silence, the students were required to pray. The Supreme Court found the statute unconstitutional. In doing so, the Court gave clear indication that a statute that did not require, but merely permitted, a student to pray, would be constitutional.
 
 
 104
 In his opinion for the Court, in which Justices Brennan, Marshall, and Blackmun joined, Justice Stevens explicitly distinguished the statute before the Court from a statute, like the one before us, that allows students opportunity to pray but does not mandate prayer:
 
 
 105
 The legislative intent to return prayer to the public schools is, of course, quite different from merely protecting every student's right to engage in voluntary prayer during an appropriate moment of silence during the school day.
 
 
 106
 Id. at 2491. I believe it to be implicit in this discussion that statutes that "merely protect[ ] every student's right to engage in voluntary prayer" carry a strong presumption of constitutionality.
 
 
 107
 The concurring and dissenting opinions in Wallace, supra, lend further support to this view. In her concurring opinion, Justice O'Connor stated that "[b]y mandating a moment of silence, a State does not necessarily endorse any activity that might occur during that period." Id. at 2499 (O'Connor, J., concurring). This statement is a reaffirmation of the Zorach principle as applied to moments of silence: if the legislation allowing for such moments does not endorse religious activity, it is not unconstitutional. And Justice Powell observed that he would "vote to uphold the Alabama statute if it also had a clear secular purpose" in addition to the religious purpose for which it was enacted. 105 S.Ct. at 2495. The citation he used to support this statement implies that he would discern secular purpose from the face of some statutes. He said, "See Mueller v. Allen, 463 U.S. 388, 394-95, 103 S.Ct. 3062, 3066, 77 L.Ed.2d 721 (1983) (the Court is 'reluctan[t] to attribute unconstitutional motives to the state, particularly when a plausible secular purpose may be discerned from the face of the statute')." Id. I believe that the text of the statute, reflects a clear secular purpose, i.e., the providing of a moment of calm before the beginning of classes. See also infra p. 253.
 
 
 108
 In their dissenting opinions in Wallace, Chief Justice Burger and Justice White emphasized the absence of coercion as a reason for holding the Alabama statute unconstitutional. The Chief Justice described the statute in Wallace thus: "Without pressuring those who do not wish to pray, the statute simply creates an opportunity to think, to plan, or to pray if one wishes--as Congress does by providing chaplains and chapels." 105 S.Ct. at 2507-08 (Burger, C.J., dissenting). He went on to state, "[i]f the government may not accommodate religious needs when it does so in a wholly neutral and noncoercive manner, the 'benevolent neutrality' that we have long considered the correct constitutional standard will quickly translate into the 'callous indifference' that the Court has consistently held the Establishment Clause does not require." Id. at 2508.
 
 
 109
 According to Justice White, "if a student asked whether he could pray during [the moment of silence], it is difficult to believe that the teacher could not answer in the affirmative." Id. (White, J., dissenting). This suggests, I think, that Justice White would consider a statute constitutional if it permitted but did not require, prayer.
 
 
 110
 The Wallace opinions also emphasize how improbable it is that a permissive, facially neutral statute will fail the effects test of Lemon. In his concurring opinion, Justice Powell stated that "the 'effect' of a straightforward moment-of-silence statute is unlikely to 'advanc[e] or inhibi[t] religion'." 105 S.Ct. at 2495. Justice O'Connor provided a lengthier explanation of why a mere minute of silence, without any encouragement to pray, passes the effect test of Lemon. She stated:
 
 
 111
 First, a moment of silence is not inherently religious. Silence, unlike prayer or Bible reading, need not be associated with a religious exercise. Second, a pupil who participates in a moment of silence need not compromise his or her beliefs. During a moment of silence, a student who objects to prayer is left to his or her own thoughts, and is not compelled to listen to the prayers or thoughts of others.... It is difficult to discern a serious threat to religious liberty from a room of silent, thoughtful schoolchildren.
 
 
 112
 105 S.Ct. at 2498-99. Under this reasoning, it is hardly possible to hold that the statute challenged here has the effect of advancing or inhibiting religion. And, indeed, the majority has conceded that the New Jersey minute of silence has no unconstitutional effect.
 
 
 113
 Logic, precedent, and the writings of a majority of the Justices suggest that a permissive, facially neutral statute such as the New Jersey moment of silence law, which has no impermissible effects and fosters an impermissible entanglement, carries with it a strong presumption of constitutionality which only the clearest proof of an absence of secular purpose can vitiate. With the nature of the New Jersey statute in mind, I turn to an analysis of its purpose, the ground upon which the majority finds the law unconstitutional. As I demonstrate in part II, clear proof of the absence of a secular purpose is surely lacking here.
 
 II. THE STATUTE'S SECULAR PURPOSE
 
 114
 The majority affirms the holding of unconstitutionality, because it believes that it cannot overturn the district court's finding that the statute lacks a secular purpose. I believe that the majority proceeds under an erroneous standard of review. I shall first explain why I believe that Bose Corp. v. Consumers' Union, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), requires that our standard of review in this case should be plenary. Next, I shall engage in plenary review of the evidence bearing on legislative purpose, and explain why I believe the evidence shows that the statute had a secular purpose. Finally, I shall demonstrate that even under a deferential standard of review, the district court's purpose finding is unsupportable.
 
 A. The Relevance of Bose
 
 115
 In Bose Corp. v. Consumers Union, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) the Supreme Court held that an appellate court is required to exercise plenary review of a lower court's finding of actual malice in a libel case. The majority would apparently limit Bose to its facts, exercising plenary review only in libel or defamation cases. I believe that this limitation represents a misreading of Bose. Bose's language and reasoning were broad; it drew from precedents in a number of first amendment cases. Because I read Bose as a statement about the role of appellate courts in first amendment cases generally, I believe that it dictates our scope of review here.
 
 
 116
 The Bose determination of whether a speaker or writer had "actual malice," like the determination of whether a legislature had a secular purpose, is a factual question concerning intent. Because it is a factual question, Fed.R.Civ.P. 52(a) would appear to require federal appellate courts to review district court's findings on the matter under a deferential standard. In Bose, however, the Court held that as a matter of constitutional law, plenary review was required:
 
 
 117
 The requirement of independent appellate review ... is a rule of federal constitutional law. It emerged from the exigency of deciding concrete cases; it is law in its purest form in our common law heritage. It reflects a deeply held conviction that judges--and particularly members of this Court--must exercise such review in order to preserve the precious liberties established and ordained by the Constitution.
 
 
 118
 104 S.Ct. at 1965. In my view, this language is applicable to any findings of a district court that implicate a party's first amendment interests. Indeed, the Court arrived at its position in Bose after a lengthy review of first amendment cases. It pointed out that it had exercised plenary review in cases involving libel, fighting words, incitement to riot, obscenity and child pornography. Id. at 1961-63.
 
 
 119
 Although the majority in this case apparently would have it differently, the Court regarded Bose not as an aberration but as an imperative of first amendment principles and jurisprudence. Plenary review is necessary to protect the delicate balance that the first amendment entails. As the Court explained, "[p]roviding triers of fact with a general description of the type of communication whose content is unworthy of protection has not, in and of itself, served sufficiently to narrow the category, nor served to eliminate the danger that decisions by triers of fact may inhibit the expression of protected ideas." Id. at 1962 (footnote omitted). Under Bose, plenary review is appropriate in a first amendment case whenever important "constitutional facts" are at issue, that is, whenever the district court's findings of fact presuppose a legal standard and have potentially grave effects on first amendment rights. The Supreme Court has recently stated this general principle: "Where, for example, as with proof of actual malice in First-Amendment libel cases, the relevant legal principle can be given meaning only through its application to the particular circumstances of a case, the Court has been reluctant to give the trier of fact's conclusions presumptive force and, in so doing, strip a federal appellate court of its primary function as an expositor of law." Miller v. Fenton, --- U.S. ----, ----, 106 S.Ct. 445, 452, 88 L.Ed.2d 405 (1985). See also Bender v. Williamsport Township, 741 F.2d 538, 542 n. 3 (3d Cir.1984) ("in the area of 'constitutional fact,' an appellate court is free to draw its own inferences from the record"), cert. granted, --- U.S. ----, 105 S.Ct. 1167, 84 L.Ed.2d 319 (1985).[5]
 
 
 120
 It should be clear that plenary review is appropriate in this case. Whether the statute had a permissible purpose is an important constitutional fact, for permissibility is determined by a legal standard and potentially grave effects on first amendment rights are at stake. Indeed, as noted above, the fact at issue here is similar to the one at issue in Bose in that both the determination of actual malice and that of secular purpose involve inquiries into states of mind, guided by complicated legal standards. Distinguishing what is religious from what is secular is a process as overlaid with constitutional considerations as deciding the difference between protected and unprotected speech. The principles that underpin Bose are thus equally forceful here.
 
 
 121
 To complete my argument in favor of plenary review, I will consider here two distinctions that one might arguably draw between the instant case and Bose and explain why I believe that neither is material. First, one might argue that Bose should be limited to cases where an appellate court reviews decisions denying assertions of first amendment rights, whereas the district court's decision in this case arguably upholds the expressive rights of citizens. I do not believe, however, that the scope of review in first amendment cases is determined by which side is favored by the district court. The appellate court's concern should be to draw first amendment boundaries correctly, not to favor one side over the other. Moreover, in its extensive summary of cases, see 104 S.Ct. at 1961-63; supra at 259-260, the Bose Court cited cases in which the lower court had both upheld and denied first amendment claims; the Court did not distinguish between the two sets of cases. Thus, the first arguable distinction is simply not tenable.
 
 
 122
 Second, one might argue that Bose should be limited to cases involving speech, and perhaps to cases involving free exercise claims, but should not be extended to establishment cases. This position requires the implicit assumption that plenary review is more important when freedom of speech (or free exercise of religion) is at issue because an erroneous determination that speech (or religious exercise) is unprotected inhibits the expression of individuals' ideas and thus impairs personal freedom. To make explicit this assumption is to reveal its falsity, for one of the most fundamental of the Founding Fathers' tenets was that individuals must be free from governmentally imposed religion. The constitutional prohibition of established religion is surely as important as the guarantee of freedom of speech.[6]
 
 
 123
 In the next section, I shall examine under a plenary standard of review the evidence relating to the purpose of the statute.
 
 B. Evidence of Legislative Intent
 
 124
 The evidence presented to the district court may be classified in five categories: testimony of three witnesses who were present at legislative hearings; newspaper accounts of the hearings; evidence of the perceptions of various citizens and citizens' groups of New Jersey about the statute's purpose; expert testimony about the pedagogical value of the statute; and seventeen prior bills proposing moments of prayer or moments of silence. I shall consider these in turn, and also consider one final piece of evidence of legislative purpose, the text of the statute itself.
 
 
 125
 1. Three people who attended the legislative hearings testified to legislators' statements concerning the religious purpose of the statute. Although the statute was debated by the full assembly and the full senate, the witnesses mentioned only two assembly members who ever referred to religion: Ms. Rhodes and Mr. Chuman repeated statements reflecting a religious purpose made by Assemblyman Zangari, and Reverend Sarfarty described a similar remark made by Assemblyman Adubato.
 
 
 126
 This evidence is simply insufficient to support a finding of a religious intent on the part of the legislature. In the first place, given its paucity, the evidence is at best underwhelming. Two assemblymen cannot be said to speak for the intent of the entire assembly and senate. See United States v. O'Brien, 391 U.S. 367, 384, 88 S.Ct. 1673, 1683, 20 L.Ed.2d 672 (1968) ("[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."). Yet there is no evidence on the record that any other assembly member or senator had a religious purpose in mind. More importantly, even this testimony is equivocal because each of the witnesses also testified to legislators' statements that the statute had a secular purpose.[7] Because we may not invalidate a statute that has a secular purpose, Lemon, supra, 403 U.S. at 611, 91 S.Ct. at 2110; see also Wallace, 105 S.Ct. at 2490, testimony that reveals both a religious and a secular purpose cannot support a finding of unconstitutionality.[8]
 
 
 127
 2. The district court also relied on newspaper articles describing the legislative hearings on the statute. Because the New Jersey legislature does not keep a record of its hearings and debates and because the district court excused the legislators from testifying about their motives in enacting the statute,[9] the district court found that there was sufficient necessity to admit the articles under the residual hearsay exception, Fed.R.Evid. 803(24).[10] The newspaper reports admitted suggested that the purpose behind the statute was to return prayer back into the public schools, surreptitiously.
 
 
 128
 There are two problems with the newspaper evidence. First, I do not believe that the newspaper accounts satisfy the requirements for admission of Fed.R.Evid. 803(24).[11] That section reads, in relevant part, as follows:
 
 
 129
 The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
 
 
 130
 * * *
 
 
 131
 * * *
 
 
 132
 (24) other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will be served by admission of the statement into evidence.
 
 
 133
 The legislative history of the Rule indicates that it was to be narrowly construed and invoked only sparingly. See S.Rep. No. 1277, 93d Cong. 2d Sess. (1974), reprinted in [1974] U.S.Code Cong. & Admin.News, pp. 7051, 7065; H.Conf.Rep. No. 1597, 93d Cong., 2d Sess. (1974), reprinted in [1974] U.S.Code Cong. & Admin.News, pp. 7051, 7105. See also In re Japanese Electronics Products, 723 F.2d 238, 302 (3rd Cir.1983) ("We note, moreover, that those exceptions are intended to have a narrow focus."); United States v. Bailey, 581 F.2d 341, 346-47 (3d Cir.1978); Robinson v. Shapiro 646 F.2d 734, 742 (2d Cir.1981); Huff v. White Motor Corp., 609 F.2d 286, 291 (7th Cir.1979).
 
 
 134
 It is clear that two of the explicit prerequisites of Rule 803(24) were not met. As the majority has observed, Maj.Op. at 252, n. 9, the plaintiffs made no showing of inability to locate observers who attended the legislative debates about the statute and three of them in fact testified. The live testimony of these witnesses was far preferrable to newspaper accounts of the debate, and, while the plaintiffs might have been able to get the names of additional observers through reasonable efforts, they made no effort to do so. Cf. Debra P. by Irene P. v. Turlington, 730 F.2d 1405 (11th Cir.1984) (consulting firm's report admitted pursuant to 803(24) only after a showing that there was no better available evidence). Thus, the newspaper clippings did not satisfy the 803(24)(B) requirement that the evidence be more probative than any other evidence that the plaintiffs could have procured through reasonable efforts.
 
 
 135
 Nor did the clippings have the requisite "circumstantial guarantees of trustworthiness." Courts admitting evidence under 803(24) require some showing that "the declarant's perception, memory, narration, or sincerity," are reliable. United States v. Friedman, 593 F.2d 109, 119 (9th Cir.1979).[12] Under this standard, the newspaper reports are of dubious validity. On the basis of the record, we do not know anything about the reliability of the articles; perception, memory, narration, and misrepresentation all present potential problems. The reporters may have been present for only part of the hearings they reported, and may not correctly have remembered or interpreted the speeches they heard. They may have simply recorded their impressions of the hearings, in which case the clippings would provide only very slender evidence of legislative intent. We have no idea of the amount of editorializing that went into the articles, which could have been written from a biased point of view. It is not unknown for reporters to stretch some facts or omit others in order to arouse public indignation.[13]
 
 
 136
 I thus conclude that the newspaper accounts were inadmissible.[14]
 
 
 137
 The second problem with the newspaper evidence is that, even if the accounts were admissible, they are ambiguous at best in establishing that the legislature had forbidden motivations in passing the statute. The newspaper accounts contain descriptions of legislators' secular purposes, as well as statements about returning prayer to the schools. For example, one article on which plaintiffs rely quoted Assemblyman Zangari as saying, inter alia, that "regardless of what some people say, this is not a prayer bill. Rather it allows each student to participate in a one-minute period of voluntary silence to be used at his or her own discretion." The Star Ledger, P. ----, col. ----, Oct. 25, 1982. It appears to me that this is clear evidence of a secular purpose that the majority and the district court have ignored.
 
 
 138
 3. Another source of evidence of religious purpose is citizens' perceptions of the statute. Proceeding under the theory that "[i]t is significant what those who opposed the Bill conceived its purposes and effects to be, because in many instances they were among those most directly affected by it," May v. Cooperman, 572 F.Supp. at 1565, the district court considered reaction to the statute by the Ethical Culture Society of Bergen County, the New Jersey School Board Association, the American Baptist Churches of New Jersey, the New Jersey Education Association, and several parents of public school students.
 
 
 139
 I believe that this evidence is very weak. Community perception is simply too amorphous and unreliable to provide the ground for constitutional decisions. The opinions and perceptions of the community are shaped by many factors--editorials, personal biases, gossip, news broadcasts, and peer pressure, for example. Such perceptions are thus unreliable indicators of what the legislative purpose of the statute in fact was.[15] These problems were exacerbated by the district court's notion that the perceptions of those who opposed the statute were particularly valuable. The perceptions of those who oppose the statute were no truer or more reliable than the perceptions of the statute's supporters. Thus, in addition to being inherently unreliable, the evidence that the district court heard was likely skewed.[16]
 
 
 140
 4. The district court heard three experts testify about the effectiveness of the minute of silence as a teaching device. Dr. Scrupski, an associate professor at Rutgers Graduate School of Education, testified that the minute of silence served a useful pedagogical function by creating a boundary between school and non-school time. The boundary was important, Dr. Scrupski explained, because it would emphasize to the students the importance of the school hours, and the fact that school hours were a time for serious work rather than undisciplined play. Dr. Kuriloff, an associate professor of education at the University of Pennsylvania, and Dr. Rosner, a professor at the Temple College of Education, testified that they believed that the moment of silence before class would not be a valuable educational tool.
 
 
 141
 Once again, I find the evidence inadequate to support a finding of no secular purpose. Not only was the testimony that there is no pedagogical merit to a minute of silence contested, but even if it had stood alone and uncontradicted it would not establish lack of secular purpose. The testimony of the plaintiffs' experts may cast doubt upon the effectiveness of the statute as a transitional, or boundary, device. But proof that the statute was an unwise or ineffective measure is not proof that it lacked a secular purpose. It is significant only if the statute seems so patently ineffective or irrelevant with respect to the alleged secular purpose that it is unreasonable to believe that the legislature enacted the statute to serve that purpose. The expert testimony in this case could not give rise to such an inference; indeed, as noted, there was disagreement among the experts as to the pedagogical merit of the statute. Under the circumstances, the expert testimony was of little value in establishing the lack of a secular purpose.
 
 
 142
 5. The district court described the attempts by prior New Jersey legislatures to pass a minute of silence or moment of prayer statute. This evidence has a more prominent role in the majority's opinion than it did in the district court's. It is clear, however, that both the district court and the majority consider the perceived purposes of the previous bills to be indicative of the purpose underlying the statute.
 
 
 143
 I believe that the previous bills are irrelevant. The bills were submitted to different legislatures with significantly different memberships. The overlap between the sponsors and supporters of the statute and the sponsors and supporters of the statute and the sponsors and supporters of the previous bills is minimal. Thus the circumstances surrounding the prior bills supply little evidence of the legislative purpose behind the present enactment. Earlier drafts of the same bill can shed light on the intent behind the final formulation, but the histories of completely separate bills have no such relevance.
 
 
 144
 6. The final evidence of legislative purpose may not be properly classifiable as evidence at all: the language of the statute itself. But the Supreme Court has stated that "a plausible secular purpose for [a] state's program may be discerned from the face of the statute." Mueller v. Allen, 463 U.S. 388, 394-395, 103 S.Ct. 3062, 3066, 77 L.Ed.2d 721 (1983). Here the neutral language of the statute is evidence in favor of a secular legislative purpose, i.e., the providing of a moment of calm before the beginning of classes.
 
 
 145
 In sum, reviewed under a plenary standard none of the evidence on which the plaintiffs rely is sufficient, separately or cumulatively, to prove an absence of any secular purpose behind the statute. The evidence is equivocal at best, and much of it may be irrelevant. The single unambiguous piece of evidence--the face of the statute itself--attests to the secular motives of the legislators. Parts of the testimony of the witnesses who attended the hearings also support this conclusion. I therefore believe that the statute has a secular purpose, that it is therefore constitutional, and that the majority is in error.
 
 
 146
 In the next section, I shall explain that I would reach the same conclusion even if we were obliged to defer to the findings of the district court.
 
 
 147
 C. Result Under a Deferential Standard of Review
 
 
 148
 My conclusion that a statute is constitutional does not depend on either the standard of review I have employed or the admissibility of the newspaper clippings. Even if we were required to defer to the district court's findings, and even if the newspaper articles were admissible under Fed.R.Evid. 803(24), I would vote to reverse the judgment of the district court. All that is required by Lemon is a secular purpose. Wallace, supra, 105 S.Ct. at 2494 (Powell, J., concurring) ("We have not interpreted the [purpose] prong of Lemon, supra, however, as requiring that a statute have 'exclusively secular' objectives."); Lynch, supra, 104 S.Ct. at 1363 n. 6 ("We hold only that Pawtucket has a secular purpose for its display, which is all that Lemon requires."). Indeed, the Supreme Court has refused to hold unconstitutional, on the ground that there was some secular reason for them, practices that would seem to be purely religious. In Lynch, for example, the municipality's celebration of Christmas and its depiction of the origins of that holiday were considered legitimate and sufficient secular purposes.
 
 
 149
 The evidence simply does not demonstrate that the statute lacks any secular purpose. Although the newspaper articles and the testimony of persons who attended the legislative hearings reveal that some legislators had prayer in mind, these very sources of evidence also contain descriptions of a secular purpose, the purpose of providing a moment of calm before the beginning of classes. As the Supreme Court has stated, "a statute that is motivated in part by a religious purpose may satisfy" the purpose prong of Lemon, as long as it has a secular aim, also. Wallace, supra, 105 S.Ct. at 2490.
 
 
 150
 Although under a deferential standard of review, I would accept the district court's decision to believe the plaintiff's expert witnesses and to disbelieve the conflicting expert testimony, I still find that this evidence about the effectiveness of the legislation has little bearing on its purpose. Nor do evidence of community perception of the legislative intent or the history of the seventeen prior minute of silence bills have much probative value in a purpose inquiry. Against this weak and possibly irrelevant evidence stands the permissive and neutral wording of the statute, with its strong indicia of constitutionality, see Part I, supra, bolstered by statements in newspaper articles and observer's testimony that at least some legislators endorsed the statute for a secular reason. I therefore conclude that the district court clearly erred in finding that the statute had no secular purpose.
 
 III. CONCLUSION
 
 151
 In sum, I agree with the majority that the statute is permissive and that it neither produces impermissible effects nor fosters excessive governmental entanglement with religion. Although the characterization of the statute as an accommodation of religion is not determinative of its constitutionality, I nonetheless have serious reservations about the majority's accommodation analysis and believe that its flaws emphasize how unlikely it is that the statute is unconstitutional. In my view, a permissive and facially neutral statute such as the New Jersey moment of silence is presumptively constitutional; that the presumption is all the stronger when, as here, the enactment passes the entanglement and effects test of Lemon; and that such a presumption cannot be overcome in the absence of clear evidence of a secular purpose.
 
 
 152
 I find that the evidence concerning lack of a secular purpose in the case does not overcome this presumption of constitutionality. I reach the same conclusion both under the plenary standard of review that I believe must employ and under the deferential standard that the majority employs. I therefore would reverse the judgment of the district court. Accordingly, I respectfully dissent.
 
 
 
 *
 Hon. Marvin Katz, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 The amount was subsequently fixed on March 28, 1984. See May v. Cooperman, 582 F.Supp. 1458 (D.N.J.1984). As this award was fixed after the notice of appeal had been filed, the issue of the fee award is not properly presented for our review. See West v. Keve, 721 F.2d 91, 94-97 (3d Cir.1983). The final declaratory judgment on the merits is nevertheless reviewable at this time. See Carpenters Health & Welfare Fund v. Kenneth R. Ambrose, Inc., 727 F.2d 279, 286 n. 2 (3d Cir.1983); West v. Keve, 721 F.2d 91, 93 (3d Cir.1983); Kane Gas Light & Heating Co. v. International Bhd. of Teamsters, 687 F.2d 673, 677 n. 5 (3d Cir.1982), cert. denied, 460 U.S. 1011, 103 S.Ct. 1251, 75 L.Ed.2d 480 (1983)
 
 
 [2]
 No party has urged that exhaustion of the remedies available under N.J.S.A. 18A:6-9 is a precondition to relief under 42 U.S.C. Sec. 1983 (1982). See New Jersey Education Ass'n v. Burke, 579 F.2d 764, 779 n. 24 (3d Cir.), cert. denied, 439 U.S. 894, 99 S.Ct. 252, 58 L.Ed.2d 239 (1978) (exhaustion of remedies before Commissioner of Education not a precondition to section 1983 relief)
 
 
 [3]
 See Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); Bender v. Williamsport Area School Dist., 741 F.2d 538 (3d Cir.1984), cert. granted, --- U.S. ----, 105 S.Ct. 1167, 84 L.Ed.2d 319 (1985)
 
 
 [4]
 The district court opinion is somewhat ambiguous in this respect. At one point the court opines. "What the minute of silence Bill has done is to mandate that all students assume the posture of one traditional form of prayer." May v. Cooperman, 572 F.Supp. 1561, 1569 (D.N.J.1983). Elsewhere the court observes
 It is unclear whether Bill 1064 requires that every student remain present during the minute of silence or whether it simply requires that every student be given an opportunity to observe a minute of silence with the right of those who do not wish to participate to absent themselves.
 Id. at 1570.
 
 
 [5]
 There is in evidence a videotape of the moment of silence observed for many years in the schools of Sayreville, New Jersey
 
 
 [6]
 The witnesses included Joseph Chuman, affiliated with the Society for Ethical Culture, Marianne Rhodes, Associate Director of Government Relations of New Jersey School Board Association, and Rev. Dudley E. Sarfaty, Associate General Secretary of the New Jersey Council of Churches
 
 
 [7]
 Every Board of Education shall:
 * * *
 (c) Require the pupils in each school in the district on every school day to salute the United States flag and repeat the following pledge of allegiance to the flag: "I pledge allegiance to the flag of the United States of America and to the republic for which it stands, one nation, under God, indivisible, with liberty and justice for all," which salute and pledge of allegiance shall be rendered with the right hand over the heart, except that pupils who have conscientious scruples against such pledge or salute, or are children of accredited representatives of foreign governments to whom the United States government extends diplomatic immunity, shall not be required to render such salute and pledge but shall be required to show full respect to the flag while the pledge is being given merely by standing at attention, the boys removing the headdress.
 N.J.S.A. 18A:36-3(c).
 
 
 [8]
 Indeed the district court found
 The experiences of various schools during the weeks when the minute of silence was enforced suggests that some students will use the minute of silence to pray; some will use it to engage in thoughtful meditation; some will tolerate it though considering it boring and stupid; some who believe it violates their religious convictions will nevertheless submit to it, not wishing to risk public ridicule; some who believe it violates their religious convictions will either refuse to observe it or will absent themselves from the place where others are observing it.
 May v. Cooperman, 572 F.Supp. at 1572.
 
 
 [9]
 The legislators contend that the district court's purpose inquiry is flawed in a number of respects. They object particularly, on hearsay grounds, to the admission in evidence of newspaper accounts of statements made by legislators as to their interest in having religion returned to the school. Plaintiffs urge that these newspaper reports were admissible under the omnibus hearsay exception in Rule 803(24) because they were more probative in showing legislative purpose than any other evidence they could produce through reasonable efforts. This is true, plaintiffs urge, because of the absence in New Jersey of transcripts of legislative proceedings and the district court's pretrial ruling that individual members of the legislature could not be deposed. This evidentiary issue is a difficult one for several reasons. First, the proponents of the evidence have made no showing that nonlegislator witnesses present during legislative sessions were unavailable. Second, the district court's recognition of a legislative privilege not to testify in a case in which legislative purpose is an issue may itself have been an error. In United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Supreme Court noted that "[w]hen the issue is simply the interpretation of legislation the Court will look to legislators for guidance as to the purpose of the legislation...." Id. at 383, 88 S.Ct. at 1682. However, the Court went on to say that such an inquiry was limited to a "well-defined class of cases where the nature of the constitutional question requires an inquiry into legislative purpose." Id. at 383 n. 30, 88 S.Ct. at 1682 n. 30. This is such a case. One may question whether the requirements of Rule 803(24) can be satisfied by virtue of such an error
 The appeal will not, however, turn on any alleged error in the admission of hearsay newspaper reports, for there is ample other evidence supporting the district court's conclusion that the purpose of the legislation was not secular but religious. The court's finding that the tendered secular purpose--the transitional moment--is pretextual is supported by credited nonhearsay testimony by experts in the educational process. Moreover there was testimony, also credited, by witnesses who attended the Senate and General Assembly Education Committee hearings, suggesting that the primary concern of the legislators supporting the bill was to permit prayer in school. Our examination of the trial court's findings of fact and conclusions of law convince us that its conclusion with respect to the absence of a secular purpose would not have been different had the newspaper clippings been excluded.
 
 
 [10]
 In Thornton v. Caldor the Court concluded that a Connecticut statute, which provided private sector employees with an absolute right not to work on their designated Sabbath, violated the establishment clause. 105 S.Ct. at 2918. Significantly, the Court did not seem to believe that the accommodating purpose of the Connecticut statute made any difference in the Court's establishment clause analysis. See id. at 2917
 
 
 [1]
 The tape of a segment of a CBS news program that was placed into evidence provides further proof, if any were needed, that the statute mandates no particular behavior on the part of the students. The tape depicted the experience of the public schools in Sayreville, New Jersey, after the enactment of the challenged statute. An actual minute of silence was shown during which students' attitudes and behavior were far from uniform. Their posture can only be described as that of studied irreverence. Cf. Wallace v. Jaffree, --- U.S. ----, 105 S.Ct. 2479, 2495 n. 9, 86 L.Ed.2d 29 (Powell, J., concurring) ("Given the types of subjects youthful minds are primarily concerned with, it is unlikely that many children would use a simple 'moment of silence' as a time for religious prayer. There are too many other subjects on the mind of the typical child.")
 
 
 [2]
 I note that Chief Justice Burger characterized the moment of silence statute at issue in Wallace as an accommodation of religion. Wallace, supra, 105 S.Ct. at 2507-08 (Burger, C.J., dissenting). It is significance that Justice Stevens' discussion in Jaffree of a pre-existing impediment requirement mentions only "our cases interpreting the Free Exercise Clause." Governmental impediments to religious observance are at the core of free exercise claims. However, Justice Stevens ignores Lynch, in which accommodation analysis was used to dispose of a claim that the government had violated the Establishment Clause
 
 
 [3]
 I speak of presumptions not in a technical sense, relating to the parties' burden of proof, but in a broader sense in which it means that such a statute is probably constitutional
 
 
 [4]
 In this case, the majority has found that the statute has no impermissible effects and does not foster governmental entanglement with religion. Thus, as noted supra, the presumption of constitutionality is particularly strong, for it is most unlikely that such an enactment has a purely religious purpose
 
 
 [5]
 That Bender involved appellate review of a summary judgment record whereas we have a full record in this case replete with factual disputes is not material. There was a disputed factual record in Bose. The appellate court's responsibility to exercise plenary review is constant no matter how the case before it arose; the inferences may be drawn from disputed as well as from undisputed records
 
 
 [6]
 Indeed in Bob Jones University v. United States, 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983), decided a year before Bose, the Supreme Court reviewed the district court's determination whether an institution's purpose was primarily educational or religious under a plenary standard of review. See also Presbyterian & Reformed Publishing Co. v. Commissioner of Internal Revenue, 743 F.2d 148, 158 n. 9 (3d Cir.1984) (Tax Court's determination that a publishing house was not sufficiently connected with a church to qualify for tax-exempt status was not entitled to deferential standard of review); Cf. Bender v. Williamsport Township, 741 F.2d 538 (3d Cir.1984) (plenary review of whether speech was secular or religious)
 
 
 [7]
 Mr. Chuman's testimony on the point was as follows:
 QUESTION: You said you heard Senator--or Assemblyman--James Zangari testify?
 ANSWER: Yes.
 QUESTION: Do you recall what he stated--was he in favor of the adoption of this law?
 ANSWER: Oh, very much so.
 QUESTION: Did he state his reasons?
 ANSWER: Well, yes he did, he thought that the moment of silence would be useful in the schools and would serve an educational purpose.
 QUESTION: What purpose?
 ANSWER: Educational purpose.
 QUESTION: A teaching purpose?
 ANSWER: Yes.
 QUESTION: Did he expand on that and say in what way?
 ANSWER: he may have, but I don't recall.
 Ms. Rhodes and Reverend Sarfarty recounted statements by other legislators that described the minute of silence as an opportunity for the students to collect their thoughts and prepare for the day's learning and as an aid in the creation of discipline and order.
 
 
 [8]
 By contrast, in Wallace, the testimony of Senator Holmes, the sponsor of the bill concerning the religious purpose of the moment of silence, was unrelieved by statements concerning a secular purpose
 
 
 [9]
 The majority states that "the district court's recognition of a legislative privilege not to testify in a case in which legislative purpose is an issue may itself have been an error." See supra at 252 n. 9. For support of this view, it relies upon United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), in which the Supreme Court stated that it would look to statements by legislators for guidance "in a very limited and well-defined class of cases where the very nature of the constitutional question requires an inquiry into legislative purpose." Id. at 383 n. 30, 88 S.Ct. at 1682 n. 30. However, the O'Brien Court was not referring to depositions or other testimony taken from legislators, but to statements contained in the official record of the legislative proceedings. In my view, the district court acted fully within its discretion in refusing to allow the plaintiffs to depose New Jersey legislators. Although the testimony in question does not fall within the provisions of either the federal or the state constitution, there may well be a common-law speech and debate privilege that protects the legislators in this situation. At all events, it would be unseemly to parade legislators before the court to testify about their intentions in enacting a statute, and, more important, the reliability of such testimony would be highly suspect. Legislators, concerned that the statute might be held unconstitutional, could view their intentions differently in hindsight. As Justice O'Connor stated in Wallace v. Jaffree, 105 S.Ct. at 2500 ("[i]t is particularly troublesome to denigrate an expressed secular purpose due to post-enactment testimony by particular legislators...."). Thus, even if there is no common-law privilege, such testimony would be subject to a ruling that it is inadmissible under Rule 403, for its probative value is substantially outweighed by the danger that it will be inaccurate and therefore confuse the issues
 
 
 [10]
 Ordinarily, when offered to prove the truth of the matters stated therein, newspaper articles are held inadmissible as hearsay. See, e.g., Pallotta v. United States, 404 F.2d 1035 (1st Cir.1968); Poretto v. United States, 196 F.2d 392 (5th Cir.1952); De La Cruz v. Dufresne, 533 F.Supp. 145 (D.Nev.1982). Robert Stigwood Group v. O'Reilly, 346 F.Supp. 376 (D.Conn.1972), rev'd on other grds., 530 F.2d 1096, cert. denied, 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976); United States v. Crocker-Anglo National Bank, 277 F.Supp. 133, 183 n. 36 (1967). See also Annot., Admissibility of Newspaper Articles as Evidence of the Truth of the Facts States Therein, 55 ALR3d 663. These authorities do not discuss the applicability of Rule 803(24), however
 
 
 [11]
 The majority, too, had some doubts about the admissibility of these documents. See Maj.Op. at 252. The majority concluded, however, that if the evidentiary ruling was indeed error, it was harmless because there was ample other evidence supporting the trial court's conclusion that the legislative purpose was religious
 
 
 [12]
 See also Weinstein & Berger, Evidence p 803(24)(1): "Such factors as the nature--written or oral--and character of the statement, the relationship of the parties, the probable motivation of the declarant in making the statement, and the circumstances under which it was made must be assessed. Also significant are the knowledge and qualifications of the declarant." (Footnotes omitted.)
 
 
 [13]
 Cf. Pittsburgh Press Club v. United States, 579 F.2d 751, 759-60 (3d Cir.1978) (ruling a survey inadmissible under Rule 803(24) because it "lacked the necessary safeguards of accuracy and flexibility") The court stated that "[i]n the context of polls and surveys, the circumstantial guarantees of trustworthiness are for the most part satisfied if the poll is conducted in accordance with generally accepted survey principles, and if the results are used in a statistically correct way, since proper survey and statistical methods are intended to assure a poll's reliability." Id. at 758. Not only are there no comparable generally accepted principles of reporting, so that the entire process is less reliable than poll-taking, but we also know nothing of the methods or motivations of the reporters who wrote the articles that were admitted into evidence
 
 
 [14]
 This conclusion is unaffected by Dallas County v. Commercial Union Assurance Co., 286 F.2d 388 (5th Cir.1961), relied upon by appellees. In Dallas County, which was decided before the adoption of the Federal Rules of Evidence, the court held a newspaper article admissible under Fed.R.Civ.P. 43(a), using the kind of approach later codified in Rule 803(24). The reasons the court gave for finding that the article met the hearsay requirements of necessity and trustworthiness are not present in this case. The article in Dallas County was more probative than any other evidence that could be obtained through reasonable efforts because the fire it described had occurred fifty-eight years before the trial. 286 F.2d at 396. Indeed, the Dallas County court went on to state that the rationale behind the "ancient documents" exception to the hearsay rule was applicable to the newspaper article in question. Id. Unlike the fifty-eight-year-old article at issue in Dallas County, the newspaper clippings admitted in this case cannot even be considered ancient documents, for under Fed.R.Evid. 803(16), an ancient document is twenty years old
 Similarly, the Dallas County court's analysis of trustworthiness does not necessarily apply the articles admitted in this case. The article admitted in that case described a fire in a public building in a small town, an event that a reporter could not fabricate without embarrassment. Unlike a fire in a public building, the statements of New Jersey legislators at hearings concerning the bill are not facts of such a public nature that they would be generally known throughout the community. While it might be inconceivable that a reporter would state that legislative hearings occurred when in fact they did not, it would not be inconceivable that he or she might, either consciously or unconsciously, give a skewed or one-sided account of what was said at the hearing. Fear of embarrassment is not such a powerful guarantee of truthfulness in this case, both because the nature of the material reported is more subjective and because the reporters were not writing for small, close-knit communities.
 
 
 [15]
 I have found only one case, Duffy v. Las Cruces Public Schools, 557 F.Supp. 1013 (D.N.M.1983) in which a court found public perception probative of legislative intent. Duffy is distinguishable because in that case there was significant direct evidence of legislative intent and the evidence of public perceptions was primarily cumulative: here, however, the other evidence of legislative intent is scant. If Duffy is not distinguishable, then I think that it was incorrectly decided, for the reasons stated in the text
 
 
 [16]
 It is interesting to note that in her opinion in Wallace, Justice O'Connor described community perception of a minute of silence as evidence of impermissible effect, rather than of impermissible purpose. 105 S.Ct. at 2500-01