Alex SANGER, et alia, Plaintiffs,

v.

Janet RENO, etc., Defendant.

No. CV–96–0526 (CPS).

United States District Court,
E.D. New York.

March 12, 1997.

---

Simon Heller, Janet Benshoof, Kathryn Kolbert, Center for Reproductive Law & Pol-

icy, New York City, Marcy Wilder, Nat. Abortion and Reproductive Action League, Washington, DC, for plaintiffs.

Stephen J. Riegel, Assistant U.S. Attorney, Igou Midian Allbray, U.S. Atty's Office, Civ. Div., Brooklyn, NY, for Janet Reno.

## MEMORANDUM AND ORDER

SIFTON, Chief Judge.

Plaintiffs bring this class action seeking a declaration that 18 U.S.C. § 1462(c) as amended by section 507 of the Communications Decency Act of 1996 ("the Act") is unconstitutional. They also seek an injunction barring its enforcement. The Act extends existing prohibitions on the transport of abortion-related information by common carrier or express services to cover the transmission of such information by interactive computer services. Plaintiffs are individuals and organizations who either use or intend to use interactive computer services to transmit or to receive information about abortions. They allege that the Act, which criminalizes commercial and non-commercial interstate speech and publications that contain information about where, how, from whom, or by what means an abortion may be obtained, violates the First Amendment.

The action names as defendant Attorney General Janet Reno in her official capacity as the chief legal official charged with enforcement of the Act. Plaintiffs also move pursuant to Rule 19(a) of the Federal Rules of Civil Procedure to join Representatives Henry Hyde and Newt Gingrich as defendants to the lawsuit.

The Attorney General moves to dismiss plaintiffs' complaint under Rule 12(b)(1) of the Federal Rules of Civil Procedure on the ground that it is not ripe for adjudication and does not present a justiciable case or controversy. She also opposes plaintiffs' motion for joinder, contending that the Representatives are immune from suit for actions taken in their official capacity and that, even if they are joined as defendants, plaintiffs' action must still be dismissed for lack of justiciability. For the reasons set forth below, plaintiffs' motion for joinder is denied and defendant's motion to dismiss the complaint for lack of subject matter jurisdiction is granted.

## BACKGROUND

The following recitation of facts is taken from plaintiffs' pleadings and papers submitted by both sides on this motion. For the purposes of these motions, plaintiffs' version of the situation is assumed to be true where it differs from defendant's.

As noted, plaintiffs are persons and organizations who currently use or intend to use interactive computer services[1] to transmit or receive abortion-related information prohibited under the Act. Plaintiff Sanger is the current president of Planned Parenthood of New York City ("PPNYC"). Under his direction, PPNYC advertises in interstate commerce using both common carriers and interactive computer services concerning abortion services available at its offices. PPNYC is a New York nonprofit corporation that provides gynecological and reproductive services to women in the New York City metropolitan area, including abortion services. PPNYC also regularly uses interactive computer services to purchase medical and surgical equipment and drugs used in performing abortions.

Plaintiff California Abortion and Reproductive Rights Action League (North) ("CARAL") is a California nonprofit organization which maintains a site on the World Wide Web[2] containing information about

---

1. The Act adopts the definition of the term "interactive computer services" as set forth in section 230(e)(2) of the communications Act of 1934. That section defines the term as:

 any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

47 U.S.C. § 230(e)(2).

2. The World Wide Web is one of the primary methods to locate and retrieve information on the Internet. It permits access to the Internet and the search for and retrieval of information located on remote computers. See *generally ACLU v. Reno*, 929 F.Supp. 824, 835 (E.D.Pa. 1996).

drugs, medicines, or other devices intended for performing abortions.

Plaintiff National Abortion and Reproductive Rights Action League ("NARAL") is a nonprofit membership organization incorporated in the District of Columbia. NARAL currently uses express companies, common carriers, and interactive computer services to gather information about abortion methods. NARAL has also entered into a contract for the construction of a NARAL site on the World Wide Web for dissemination of information about abortions.

Plaintiff Feminist Majority Foundation ("FMF") is a nonprofit research and educational organization with the objective of increasing the empowerment of women. FMF uses interactive computer services to disseminate information about drugs, medicines, or other devices intended for use in producing abortions.

Plaintiff Medical Students for Choice ("MSFC") is a national organization founded by medical students concerned about the shortage of abortion practitioners, the lack of abortion education in medical schools, and the escalating violence against abortion providers. MSFC utilizes interactive computer services on the Internet and World Wide Web to provide or obtain information about abortions.

Plaintiff Rhonda Copelon is a professor of law at the City University of New York law school, located within this District, in Queens, New York. As part of her academic research, she receives by common carriers and interactive services in interstate and foreign commerce "cards, letters, circulars, books, advertisements or notices" about where, how, from whom, or by what means items designed, adapted, or intended to produce abortions may be obtained.

Plaintiff Adam Guasch–Melendez maintains a site on the World Wide Web that contains information about how, where, from whom, or by what means abortions may be obtained.

Plaintiff National Abortion Federation ("NAF") is a nonprofit professional association of abortion providers representing physicians, nurses, administrators, counselors, and other medical staff at abortion facilities throughout the United States. NAF regularly uses common carriers and express companies to obtain and receive information about abortions. NAF is also planning on "going on Internet within the next few months as an organization." Currently, one of NAF's staff members uses the Internet to transmit and receive information on behalf of NAF and many of NAF's members use the Internet regularly to exchange information on abortion practices.

On February 7, 1996, plaintiffs filed the complaint in this action challenging the constitutionality of the Act on the basis that it violates the right to freedom of speech and freedom of the press under the First Amendment to the U.S. Constitution.[3] Plaintiffs bring their complaint on behalf of all other individuals and organizations similarly situated and seek, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, to represent a class of all individuals and organizations in the United States who use or seek to use express companies, common carriers, or interactive computer services to carry or receive information in interstate or foreign commerce about where and how to obtain abortions. Plaintiffs seek a declaration that the Act is unconstitutional and an injunction prohibiting enforcement of the Act pursuant to 28 U.S.C. §§ 2201, 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the "general legal and equitable powers of this Court."

After initial argument on defendant's motion to dismiss the complaint for lack of subject matter jurisdiction, plaintiffs moved to join as defendants United States Representatives Henry Hyde of Illinois and Newt Gingrich of Georgia, in their official capaci-

---

**3.** Plaintiffs originally asserted two additional claims against defendant, alleging that the Act was overly vague in violation of due process and that it unreasonably burdened a woman's right to make personal reproductive decisions. Plaintiffs subsequently conceded, however, their lack of standing to pursue those two claims. Only the First Amendment claim for relief is being pursued by plaintiff in the face of the motion to dismiss.

ties, pursuant to Rule 19(a)(1) of the Federal Rules of Civil Procedure.[4]

## Statutory Provision

In 1897, Congress passed 18 U.S.C. § 1462 ("§ 1462") which, *inter alia*, made it a felony to transport by common carrier or express service in interstate or foreign commerce items or products intended to induce abortion or information about obtaining such items or products. *See* Act of Feb. 8, 1897, ch. 172, 29 Stat. 512 (1897).[5] In the 99 years since its enactment, there have been no reported decisions reflecting the use of § 1462 to prosecute abortion-related speech. In 1981, after two district courts declared the abortion-related provisions of two similar criminal statutes unconstitutional,[6] *see Atlanta Coop. News Project v. United States Postal Serv.*, 350 F.Supp. 234, 238–39 (N.D.Ga. 1972); *Associated Students for Univ. of California at Riverside v. Attorney General*, 368 F.Supp. 11, 21–24 (C.D.Cal.1973), United States Attorney General Benjamin Civiletti sent a letter to Walter Mondale as President of the Senate stating his belief that the statutes were unconstitutional and announcing that his department would not prosecute persons violating those statutes.[7] *See* Letter from Benjamin R. Civiletti, U.S. Attorney General, to the Honorable Walter F. Mondale, President of the Senate (Jan. 13, 1981) (Ex. 1 attached to defendant's memorandum in support of her motion to dismiss).[8] The Attorney General left open the possibility that those statutes might be applied to commercial speech. *Id.* However, two years later, the Supreme Court held that 39 U.S.C. § 3001 could not be applied to commercial speech concerning contraception, at least where the speech was truthful and not misleading. *See Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). The Justice Department has since taken the position that the holding in *Bolger* applies to abortion-related speech, relying upon *Bigelow v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) (holding that commercial speech concerning abortion services was protected under the First Amendment). See Letter from Janet Reno, U.S. Attorney General, to the Honorable Albert Gore, Jr., President of the Senate (February 9, 1996).

On February 8, 1996, Congress amended § 1462 to extend its prohibitions of the transportation of obscene and abortion-related materials to cover transmission of such materials using interactive computer services. *See* The Communications Decency Act § 507, contained within Title V of the Telecommunications Act of 1996. The amended statute provides in pertinent part:

Whoever brings into the United States, or any place subject to the jurisdiction thereof, of knowingly uses any express company or other common carrier *or other interactive computer service (as defined in section 230(e)(2) of the Communications Act of 1934)* for carriage in interstate or foreign commerce—... (c) any drug, medicine, article, or thing designed, adapted, or intended for producing abortion, or for any indecent or immoral use; or any written or

---

**4.** Rule 19(a) of the Federal Rules of Civil Procedure provides, in relevant part:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties.

**5.** The Act also contains similar prohibitions on the importation or transportation of obscene materials.

**6.** 18 U.S.C. § 1361 and 39 U.S.C. § 3001(e) prohibit the transport of abortion-related items and information by mail.

**7.** The Attorney General is obligated to notify Congress whenever the Justice Department establishes a policy to refrain from enforcing or determines not to contest or defend any provision of law enacted by Congress on the basis that such provision is unconstitutional. *See* Pub.L. No. 96–132, § 21(a)(2), 93 Stat. 1040, 1049 (1979) (reenacted pursuant to a series of appropriations bills, *see, e.g.,* H.R.Conf.Rep. 104–537 [on H.R. 3019], 104th Cong., 2d Sess., tit. I § 616, 142 Cong. Rec. H3842–02, *H3859 (Apr. 25, 1996)).

**8.** If necessary, Judicial notice is taken of this letter and the letters sent by defendant to the President of the Senate and the Speaker of the House on February 9, 1996. *See Kramer v. Time Warner*, 937 F.2d 767, 774 (2d Cir.1991); Fed. R.Evid. 201.

printed card, letter, circular, book, pamphlet, advertisement, or notice of any kind giving information, directly or indirectly, where, how, or of whom, or by what means any of such mentioned articles, matters, or things may be obtained or made; or

Whoever knowingly takes *or receives* from such express company or other common carrier *or interactive computer service (as defined in section 230(e)(2) of the Communications Act of 1934)* any matter or thing the carriage *or importation* of which is herein made unlawful—

Shall be fined under this title or imprisoned not more than five years, or both, for the first such offense and shall be fined or imprisoned not more than ten years, or both, for each such offense thereafter.

18 U.S.C. § 1462 (1996 amendments italicized).[9]

Violation of the Act is a felony. *See* 18 U.S.C. § 3559(a). In addition to possible imprisonment of up to ten years, individuals violating the Act may be fined as much as $250,000, *see* 18 U.S.C. § 3571(b); organizations violating the Act may be fined up to $500,000. *See* 18 U.S.C. § 3571(c).

In the Joint Explanatory Statement of the Committee of Conference ("Explanatory Statement"), Congress explicitly noted its intent to leave in force all pre-existing provisions of 18 U.S.C. § 1462, and the Explanatory Statement made no mention of the constitutionality of the abortion-related provisions. However, upon signing the legislation into law, President Clinton announced that the Act would not be enforced as applied to abortion-related speech:

I ... object to the provision in the Act concerning the transmittal of abortion-related speech and information. Current law, 18 U.S.C. 1462, prohibits transmittal by interactive computer services. The Department of Justice has advised me of its

long-standing policy that this and related abortion provisions in current law are unconstitutional and will not be enforced because they violate the First Amendment. The Department has reviewed this provision of S. 652 and advises me that it provides no basis for altering that policy. Therefore the Department will continue to decline to enforce that provision of current law, amended by this legislation, as applied to abortion-related speech.

*See* Letter from Janet Reno, Attorney General, to the Honorable Albert Gore, Jr., President of the Senate, and the Honorable Newt Gingrich, Speaker of the House (Feb. 9, 1996) (Ex. 2 attached to defendant's memorandum in support of her motion to dismiss).

On February 9, 1996, defendant submitted a letter to Vice–President Gore in his position as President of the Senate to announce her belief that § 1462 as applied to abortion-related speech, whether commercial or non-commercial, was unconstitutional and that, in accordance with her department's long-standing policy in this regard, it would not enforce this provision. *See id.*[10]

On February 7, 1996, plaintiffs filed this suit against the Attorney General requesting a declaration that the Act is unconstitutional and an injunction against its enforcement. Defendant now brings this motion to dismiss plaintiffs' complaint under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of ripeness and lack of a justiciable case or controversy. Plaintiffs oppose defendant's motion and move to join United States Representatives Henry Hyde and Newt Gingrich as defendants to the complaint. In support of their motion for joinder, plaintiffs contend that the two representatives will defend the Act's constitutionality and will "aid this Court in finding that a case or controversy required by Article III is present...." Defendant opposes plaintiffs' motion for joinder,

---

**9.** The 1996 amendment also extends the prohibitions against transportation of obscene materials to interactive computer services. *See* 18 U.S.C. § 1462.

**10.** Plaintiffs assert, and defendant does not dispute, that the plain meaning of the Act's phrase "any written or printed card, letter, circular, book, pamphlet, advertisement or a notice of any

kind giving information, directly or indirectly, where, how, or of whom, or by what means any of such mentioned articles, matters, or things [to produce abortion] may be obtained or made," includes both commercial and non-commercial speech about abortions, and that such prohibitions are clearly unconstitutional under existing First Amendment jurisprudence.

arguing that the Congressmen are immune from suit under the Speech and Debate Clause of Article I of the U.S. Constitution and that, even if they were joined as defendants, plaintiffs' complaint should still be dismissed for lack of ripeness and justiciability.

## DISCUSSION

When parties make multiple motions that include a motion to dismiss for lack of subject matter jurisdiction, the court should " 'consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined.' " *Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir.1990) (quoting 5 C. Wright and A. Miller, *Federal Practice and Procedure* § 1350, at 548 (1969)). Accordingly, defendant's contention that this Court lacks subject matter jurisdiction over this action is addressed first.

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides for the dismissal of a complaint when the federal court "lacks jurisdiction over the subject matter." Article III of the U.S. Constitution in turn limits the jurisdiction of federal courts to "cases or controversies." The term "case or controversy" has been construed to exclude from its scope hypothetical or abstract disputes: "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality" to justify judicial resolution. *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941).[11] Every action before a federal court must be "justiciable," i.e., one in which jurisdiction under the Constitution exists and that is "appropriate for judicial determination." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617,

*reh'g denied,* 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937) (citations omitted).

Because the federal government is a government of limited powers, federal courts are presumed to lack jurisdiction "unless the contrary appears firmly in the record." *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 546, 106 S.Ct. 1326, 1334, 89 L.Ed.2d 501 (1986) (citation omitted). Thus, it is the plaintiffs' responsibility to allege facts demonstrating that this is a proper instance to invoke judicial resolution of the dispute and the exercise of the court's remedial powers. *See Bender*, 475 U.S. at 546 n. 8, 106 S.Ct. at 1334 n. 8; *Renne v. Geary*, 501 U.S. 312, 316, 111 S.Ct. 2331, 2336, 115 L.Ed.2d 288 (1991).

For a case to be deemed justiciable under Article III, it must be ripe. *Abbott Labs. v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Ripeness is a "constitutional prerequisite to exercise of jurisdiction by federal courts," *Federal Election Comm'n v. Central Long Island Tax Reform Immediately Comm.*, 616 F.2d 45, 51 (2d Cir.1980) (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. at 240–41, 57 S.Ct. at 463–64). Ripeness requires a pre-enforcement challenge to a statute to grow out of a "real, substantial controversy between parties" involving a "dispute definite and concrete." *Id.* (citations omitted); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

"[R]ipeness is peculiarly a question of timing," *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 140, 95 S.Ct. 335, 357, 42 L.Ed.2d 320 (1974), intended "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs.*, 387 U.S. at 136, 87 S.Ct. at 1515. Its purpose is to forestall judicial determinations of disputes until they are presented in a concrete form. *See Renne v. Geary*, 501 U.S. 312, 322, 111 S.Ct. 2331, 2339, 115 L.Ed.2d

---

11. The fact that plaintiffs request declaratory judgment under 28 U.S.C. § 2201 does not lessen the need for a showing of justiciability. Although 28 U.S.C. § 2201 authorizes a court to declare the rights of the parties before it, it does not permit relief which is not "consonant with the exercise of the judicial function in the determination of controversies to which under the Constitution the judicial power extends." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937).

288 (1991) (*citing Rescue Army v. Municipal Court of Los Angeles,* 331 U.S. 549, 584, 67 S.Ct. 1409, 1427, 91 L.Ed. 1666 (1947)).

The resolution of questions of justiciability and ripeness are generally fact-based, with the results turning on "an assessment of the particular action's place on a continuum from clearly justiciable to clearly unjusticiable." *League of Women Voters of California v. FCC,* 489 F.Supp. 517, 519 (C.D.Cal.1980). The focus of any ripeness inquiry is generally guided by a two-pronged analysis, requiring courts to consider 1) the fitness of judicial issues for decision and 2) the injury or hardship to the parties of withholding judicial consideration. *See Abbott Labs.,* 387 U.S. at 149, 87 S.Ct. at 1515–16; *AMSAT Cable v. Cablevision of Conn.,* 6 F.3d 867, 872 (2d Cir.1993); *In re Drexel Burnham Lambert Group Inc.,* 995 F.2d 1138, 1146 (2d Cir.1993).

### Fitness of Judicial Issues for Decision

In determining whether a claim is fit for judicial review, the question is whether consideration of the underlying legal issues would be facilitated if raised in the context of a specific attempt to enforce the challenged provisions. *See Gardner v. Toilet Goods Assoc.,* 387 U.S. 167, 171, 87 S.Ct. 1526, 1528–29, 18 L.Ed.2d 704 (1967); *In re Combustion Equip. Assoc., Inc.* 838 F.2d 35, 37–38 (2d Cir.1988).

In this case, both parties agree that the Act's provisions relating to abortion speech are, on their face, unconstitutionally violative of First Amendment rights, as applied to both commercial and non-commercial speech. Existing jurisprudence substantiates the parties' opinions. *See Bolger v. Youngs Drug Products Corp.* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983); *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). From their perspective, this First Amendment facial challenge will not be significantly clarified by further factual development. *Cf. Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Comm'n,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1720–21, 75 L.Ed.2d 752 (1983); *Poe v. Ullman,* 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961).

To be sure, different modes of communication have received different treatment under the First Amendment. *See Kovacs v. Cooper,* 336 U.S. 77, 97, 69 S.Ct. 448, 458–59, 93 L.Ed. 513 (1949) (Jackson, J., concurring); *Turner Broadcasting Sys., Inc. v. FCC,* 512 U.S. 622, 636–38, 114 S.Ct. 2445, 2456, 129 L.Ed.2d 497 (1994); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). Although content-based restrictions on speech are usually struck down, a medium-specific approach has in the past led to different outcomes. *See FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). However, even considering the rapidly developing nature of interactive computer services, *see ACLU v. Reno,* 929 F.Supp. 824 (E.D.Pa. 1996), it is difficult to say that the particular facts surrounding a potential prosecution under the Act would assist in determining the extent of First Amendment protection for activities covered by the statute.

### Hardship to the Parties of Withholding Judicial Resolution

In assessing the hardship to the parties of withholding judicial resolution, the question is whether the challenged action creates a direct and immediate dilemma for the parties. *See Abbott Labs.,* 387 U.S. at 152–53, 87 S.Ct. at 1517–18. When declaratory and injunctive relief against the enforcement of a criminal statute is sought, the Supreme Court has typically required that the plaintiff show either prosecution under the statute or that a sufficiently real and immediate threat of prosecution exists. *See, e.g., Poe v. Ullman,* 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989, *reh'g denied,* 368 U.S. 869, 82 S.Ct. 21, 7 L.Ed.2d 69 (1961) (no justiciability where only one prosecution brought under 1879 statute in a case testing its constitutionality, and no explicit nor implicit threat of enforcement); *see also Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Steffel v. Thompson,* 415 U.S. 452, 475, 94 S.Ct. 1209, 1223–24, 39 L.Ed.2d 505 (1974); *United Public Workers v. Mitchell,* 330 U.S. 75, 90, 67 S.Ct. 556, 564–65, 91 L.Ed. 754 (1947). A determination will still be ripe, however, where en-

forcement is delayed, but inevitable. *See Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) (where enforcement is inevitable, delay before the provisions came into effect is irrelevant to determination of justiciability).

This traditional ripeness analysis has been relaxed somewhat where a facial challenge implicates First Amendment values. *See Steffel v. Thompson,* 415 U.S. 452, 475, 94 S.Ct. 1209, 1223–24, 39 L.Ed.2d 505 (1974); *New York Public Interest Group v. Village of Roslyn Estates,* 498 F.Supp. 922, 928–29 (E.D.N.Y.1979); *New Mexicans for Bill Richardson v. Gonzales,* 64 F.3d 1495, 1499 (10th Cir.1995). In the First Amendment context, the injury requirement is less strict than in other contexts. *See Bates v. State Bar of Arizona,* 433 U.S. 350, 380, 97 S.Ct. 2691, 2707, 53 L.Ed.2d 810, *reh'g denied,* 434 U.S. 881, 98 S.Ct. 242, 54 L.Ed.2d 164 (1977); *Hallandale Professional Fire Fighters Local 2238 v. Hallandale,* 922 F.2d 756, 760 (11th Cir.1991) (citations omitted). In the context of a First Amendment facial challenge to the validity of a statute, reasonable predictability of enforcement or threats of enforcement even where enforcement is not impending are sometimes enough to ripen a claim. *See Laird v. Tatum,* 408 U.S. 1, 12, 92 S.Ct. 2318, 2325, 33 L.Ed.2d 154 (1972); *Steffel v. Thompson,* 415 U.S. 452, 456–57, 94 S.Ct. 1209, 1214–15, 39 L.Ed.2d 505 (1974); *Martin Tractor Co. v. Federal Election,* 627 F.2d 375, 380 (D.C.Cir.), *cert. denied,* 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 218 (1980). However, courts have uniformly insisted, even in the First Amendment context, that there must still exist some credible fear of enforcement. *Laird,* 408 U.S. at 13–14, 92 S.Ct. at 2325–26; *Steffel,* 415 U.S. at 475, 94 S.Ct. at 1223–24, 39 L.Ed.2d 505 (1974); *Younger v. Harris,* 401 U.S. 37, 41–42, 91 S.Ct. 746, 749–50, 27 L.Ed.2d 669 (1971); *Renne v. Geary,* 501 U.S. 312, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991).

Plaintiffs have not demonstrated the requisite showing of an impending threat of prosecution under the Act under the traditional ripeness analysis. Where, as here, the statute has been on the books for decades and has never been enforced, there is no credible threat of either imminent or delayed enforcement. *Cf. Poe v. Ullman,* 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989, *reh'g denied,* 368 U.S. 869, 82 S.Ct. 21, 7 L.Ed.2d 69 (1961). Plaintiffs have not demonstrated that defendant is likely to interrupt her course of silence and non-prosecution; on the contrary, she has recently made an explicit and public statement that she will continue the Department of Justice's traditional policy of non-enforcement.

Moreover, even under the relaxed standard applicable in the First Amendment context plaintiffs do not demonstrate a credible fear of enforcement of this Act by defendant. Plaintiffs argue that the emotionally-charged and controversial nature of abortion issues in this country places them in "ever-present" danger of enforcement and "demonstrate[s] that all normal expectations that government will not seek to enforce unconstitutional laws [do] not apply in the abortion arena." To support their contentions, they point to the recent "revival" and enforcement of several long-dormant state statutes by state or local officials, despite their allegedly patent unconstitutionality. However, uncertainty about enforcement does not establish a credible basis for fearing enforcement, much less a likelihood of enforcement. If federal courts had jurisdiction to decide disputes wherever uncertainties exist, their jurisdiction would be unending.

Nor does the recent affirmative steps by Congress to amend the statute and extend its scope, despite the U.S. Attorney General's declaration of its unconstitutionality, increase the likelihood of enforcement. To be sure, in amending the statute, Congress explicitly stated that the amendment should not be construed to repeal any previous provisions, including those prohibitions of abortion-related speech transmitted by common carrier or express service. In addition, the sponsor of the amendment, Representative Hyde, made a public statement about the statute's applicability to abortion-related speech, implicitly pronouncing the statute

constitutional.[12] These steps arguably reflect Congress' perception that the statute is constitutional and its intent that it be enforced.

■ The executive branch, however, enforces the law, not Congress. See U.S. Const., Art. II, § 3 (the President "shall take Care that the Laws be faithfully executed"); 28 U.S.C. § 516 ("[T]he conduct of litigation in which the United States, an agency, or an officer thereof is a party ... is reserved to officers of the Department of Justice, under the direction of the Attorney General."); *Buckley v. Valeo*, 424 U.S. 1, 138–39, 96 S.Ct. 612, 691–92, 46 L.Ed.2d 659 (1976); *Inmates of Attica Correctional Facility v. Rockefeller*, 477 F.2d 375, 379–80 (2d Cir.1973). Both the Chief Executive and his principal law enforcement officer have publicly announced their intention not to enforce the law, not once but on several occasions. As a practical matter, of course, (and ripeness is a practical issue), Congress possesses the power of the purse which, if exercised, can induce activity by the executive branch which it might otherwise not engage in. No efforts along those lines have been taken by Congress in this case, however, either in response to the President's or the Attorney General's statements made many months ago. Nor has it responded to the formal notification given it by defendant in this case or by her predecessors in related situations. As a result, one must conclude that both Congress and the Executive are content to leave matters at a standstill. Prudence and jurisprudence dictate that the judiciary not create a controversy where none existed before. The choice between prosecuting and not prosecuting this Act is entirely within the discretion of the U.S. Attorney General. *See, e.g., Merrill Lynch v. Cavicchia*, 311 F.Supp. 149, 158–59 (S.D.N.Y.1970); *see also Walker v. Reno*, 925 F.Supp. 124, 127 (N.D.N.Y.1995); *St. Martin's Press, Inc. v. Carey*, 605 F.2d 41, 45 (2d Cir.1979). I conclude, accordingly, that plaintiffs have not demonstrated a credible threat of enforcement.

■ Notwithstanding the absence of any indication of hardship from impending prosecution or threats of prosecution, plaintiffs' claim might still be ripe under First Amendment jurisprudence if their First Amendment rights have been restricted or "chilled" by the existence of the Act.[13] Where the existence of a challenged statute results in third parties acting in a way that infringes upon the plaintiffs' exercise of those First Amendment rights, a case will be ripe. *See ACLU v. Jennings*, 366 F.Supp. 1041 (D.D.C. 1973) (three-judge court) (chilling effect felt from reporting and disclosure requirements of statute where, as a result of statute, newspaper refused to publish plaintiffs' advertisement), *vacated as moot sub nom. Staats v. ACLU*, 422 U.S. 1030, 95 S.Ct. 2646, 45 L.Ed.2d 686 (1975); *Postal Service v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981) (justiciability not issue where postmaster notified that mailing of letters could result in fine despite no contact with enforcement agencies); *New York Public Interest Research Group, Inc. v. Village of Roslyn Estates*, 498 F.Supp. 922 (E.D.N.Y.1979) (existence of challenged statute permitted third-party village to deny plaintiffs' request to canvass in violation of First Amendment) "First Amendment interests are fragile interests, and a person who contemplates protect-

12. Representative Henry Hyde, Chairman of the House Judiciary Committee, stated:

Concerns have been raised about the amendment to 18 U.S.C. § 1462 regarding an interactive computer service.... This language is no way intended to inhibit free speech about the topic of abortion, nor in any way to limit medical or scientific discourse on the Internet. This amendment to subsection 1462(c) does not prohibit serious discussions about the moral questions surrounding abortion, in the act of abortion itself, or the constitutionality of abortion. This statutory language is confined to those commercial activities already covered in section 1462(c) of title 18 and in no way inter-

feres with the freedom of individuals to discuss the general topic of abortion on the Internet. 142 Cong.Rec. H1, 159 (daily ed. Feb. 1, 1996).

13. As one commentator has stated, "First Amendment rights of free expression and association are particularly apt to be found ripe for immediate protection because of the fear of irretrievable loss. [C]ourts have [frequently] found First Amendment claims ripe, often commenting directly on the special need to protect against any inhibiting chill." 13A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3532.3, at 159.

ed activity might be discouraged by the in terrorem effect of the statute." *Bates v. State Bar of Arizona*, 433 U.S. 350, 380, 97 S.Ct. 2691, 2707, 53 L.Ed.2d 810, *reh'g denied*, 434 U.S. 881, 98 S.Ct. 242, 54 L.Ed.2d 164 (1977) (*citing NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 337–38, 9 L.Ed.2d 405 (1963)).[14]

 However, allegations of a "subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm," *Laird v. Tatum*, 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972), where not substantiated by evidence that the challenged statute is having an immediate and concrete effect. *Meese v. Keene*, 481 U.S. 465, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987); *Steffel v. Thompson*, 415 U.S. 452, 475, 94 S.Ct. 1209, 1223–24, 39 L.Ed.2d 505 (1974); *Younger v. Harris*, 401 U.S. 37, 41–42, 91 S.Ct. 746, 749–50, 27 L.Ed.2d 669 (1971); *St. Martin's Press, Inc. v. Carey*, 605 F.2d 41, 44 (2d Cir.1979). Plaintiffs concede that Internet access providers are not subject to the Act. Plaintiffs' speech will not be restricted by access providers' denying access in order to comply with the Act since it does not apply to the access providers. Plaintiffs instead argue that the Act may be used as a pretext or justification by Internet access providers and other third parties to place restrictions on abortion speech which they are otherwise prepared to impose.

However, plaintiffs again provide no factual showing that access providers are, as a result of the statute's enactment, in fact predisposed to deny access to interactive computer services for the dissemination of abortion speech, that they have taken any steps to act on such a disposition, or even that third-party access providers could in fact prevent transmittal of such information.[15] In a recent challenge to the constitutionality of the same statute, the court made relevant findings of fact on the nature of interactive computer services. *ACLU v. Reno*, 929 F.Supp. 824, 830–49 (E.D.Pa.1996). The court noted:

> Internet is a "decentralized, global medium of communications—or 'cyberspace'—that links people, institutions, corporations, and governments around the world.... There is no centralized storage location, control point, or communications channel for the Internet and it would not be technically feasible for a single entity to control all of the information conveyed on the Internet.... No single organization controls any membership ... nor is there any single centralized point from which individual Web sites or services can be blocked from the Web."

*Id.* at 831, 832, 839.

In light of the above, plaintiffs' argument that access providers might chill plaintiffs' First Amendment rights by reinforcing the predispositions of third parties seems improbable and not technically feasible.[16] Furthermore, plaintiffs' argument ignores the fact that prior to the Act's extension to the Internet, many of the plaintiffs, as asserted in their affidavits, maintained sites on the Internet or regularly used Internet to transmit and receive abortion-related information. Because these Internet providers are not state actors, they are free to impose content-based restrictions on access to the Internet without implicating the First Amendment. If Internet access providers were predisposed against abortion, they could have restricted plaintiffs from transmitting or re-

---

**14.** Likewise, the impingement of a plaintiff's First Amendment rights resulting from the initiation of a prosecution, regardless of its probability of success, may suffice to ripen a claim. *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

**15.** Defendant argues that, because these access providers are not government actors, steps to limit speech would not violate the First Amendment and therefore would not make this case ripe. However, this argument ignores the chilling effect that these actors might have on plain-

tiffs' First Amendment rights if they relied on the statute, even believing it unconstitutional, to limit plaintiffs' speech. *See, e.g., Village of Roslyn Estates*, 498 F.Supp. at 922.

**16.** Given the decentralized nature of the Internet, it might be more probable that plaintiffs' First Amendment rights would be chilled by those who transport abortion-related information and materials by common carriers and express services. However, plaintiffs have provided no evidence to this effect and admit that they transport such materials regularly by those means.

ceiving such information before now. *Cf. San Francisco County Democratic Cent. Comm. v. Eu,* 826 F.2d 814, 821 (9th Cir. 1987), *aff'd,* 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) (even though statute never enforced, case is ripe where no record that commonly and notoriously violated and no explicit disavowal of enforcement); *Barker v. State of Wisconsin Ethics Board,* 815 F.Supp. 1216, 1220 (W.D.Wis.1993) (same). Thus, the theory that the Act might reassure hesitant but pre-disposed access providers that they could forbid such access is speculative. An access provider may possess its own First Amendment rights to impose limits on access to speech on the Internet since the government has not imposed any statutory or regulatory restrictions on providing access. *Cf. Turner Broadcasting System, Inc. v. F.C.C.,* 512 U.S. 622, 636–38, 114 S.Ct. 2445, 2456, 129 L.Ed.2d 497, *reh'g denied,* 512 U.S. 1278, 115 S.Ct. 30, 129 L.Ed.2d 927 (1994) (recognizing cable television programmer's right to control cable programming).

Plaintiffs argue that the court in *Meltzer v. Board of Public Instruction of Orange County,* 548 F.2d 559, 572–73 (5th Cir.1977), *aff'd in relevant part en banc by an equally divided vote,* 577 F.2d 311, 312 (5th Cir.1978), found an action similar to this one justiciable. However, the differences between that case and this one illustrate the deficiencies in the showing made here. In *Meltzer,* plaintiff parents of school children sued for declaratory and injunctive relief under the First Amendment against a school board that had adopted a program for organizing school prayers and distributing Bibles in public schools, in reliance on a state statute that required school teachers to "inculcate ... Christian values." *Id.* The court found the case justiciable because there was evidence that, despite defendant's agreement to discontinue their policy, the practices were in fact continuing; the defendants had adopted their policy in reliance on the statute; the defendants had a motion pending before the school board to continue the policy of distributing Bibles pending the outcome of the suit; and the state statute could still be enforced by the state. *Id.* Based upon these factors, the court found that the conduct of defendants had continuing adverse effects on plaintiffs' First Amendment interests. Regarding the state statute, the court found that, since the statute required teachers to affirmatively "inculcate Christian values," the fact that no enforcement actions were brought against the teachers meant that the teachers were acting in accordance with the statute's mandate. *Id.* at 572.

 Plaintiffs argue that a decision that this action is not ripe may deprive them of effective relief should they be later prosecuted. A case may be ripe where denial of review would cause the loss of crucial collateral claims or the loss of First Amendment rights. *See American–Arab Anti–Discrimination Committee v. Reno,* 70 F.3d 1045, 1057 (9th Cir.1995) (the chill of "First Amendment rights is an irreparable injury that cannot be vindicated by post-deprivation review."); *Mathews v. Eldridge,* 424 U.S. 319, 331 n. 11, 96 S.Ct. 893, 901 n. 11, 47 L.Ed.2d 18 (1976) (ripeness exists where later review would not prevent loss of "crucial collateral claims"); *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (ripe because of significant collateral injuries).

 Although plaintiffs' First Amendment rights might suffer irretrievable loss were plaintiffs forced to bring their action after enforcement, there is no reason why plaintiffs would have to wait until they were actually prosecuted under the Act to proceed with their constitutional challenge. If the government decides to change its policy and enforce the provision, due process requires advance public notice. *See Salvation Army v. New Jersey Dept. of Community Affairs,* 919 F.2d 183, 192 (3d Cir.1990) (finding that "defendants, even if they should attempt to extricate themselves from their commitment regarding those provisions, could not impose a fine without giving notice and an opportunity to comply"). Moreover, defendant has explicitly undertaken in her February 9, 1996 letter that "[s]hould there ever be a material change in the Attorney General's position ... we will publicly announce it, and we will expressly encourage future Attorneys Gener-

al to do the same."[17] Due process would prevent an agency from reversing its policy and prosecuting a person who transmitted or received such information in reliance upon the previous policy. *See Salvation Army v. New Jersey Dept. of Community Affairs*, 919 F.2d 183, 192 (3d Cir.1990).

■ Plaintiffs have not demonstrated that they will suffer significant collateral injuries if review at this time is denied. They have also not shown that a decision today to refrain from hearing this challenge would oblige them to make a post-deprivation challenge, divesting them of their First Amendment rights.[18]

Because plaintiffs have not demonstrated any hardship resulting from a denial of review at this time, plaintiffs' pre-enforcement facial challenge to the constitutionality of the Act on First Amendment grounds is not ripe. Thus, there is no justiciable case or controversy upon which to base jurisdiction.

### Plaintiffs' Motion for Joinder

■ Plaintiffs move to join United States Congressmen Henry Hyde and Newt Gingrich as defendants to this suit, contending that their joinder "will aid this Court in finding that a case or controversy required by Article III is present." Plaintiffs argue that Representative Hyde, the Act's sponsor, and Representative Gingrich, who supported the Act's passage, will defend the constitutionality of the Act. They also argue that any pressure to persuade the Attorney General or her successor to enforce the Act will originate from these congressman.

■ Rule 19(a)(1) of the Federal Rules of Civil Procedure provides for the joinder of parties where "in the person's absence complete relief cannot be accorded among those already parties."[19] However, joinder of a party cannot be used to "vest a federal court with jurisdiction when it previously had none." *See Coditron Corp. v. AFA Protective Systems, Inc.*, 392 F.Supp. 158, 161 (S.D.N.Y.1975) (citation omitted). Accordingly, the language of Rule 19, which requires that joinder of a person "not deprive the court of jurisdiction over the subject

---

**17.** Plaintiffs assert that they should be given a personal thirty-day notice prior to any change of policy. They argue that defendant's unwillingness to do so, as asserted in two letters from defendant attached as exhibits one and two to plaintiffs' memorandum in opposition, creates a justiciable claim. They base their argument on an erroneous reading of *Salvation Army*, 919 F.2d 183 (3d Cir.1990). Plaintiffs argue that that case "implicitly recognize[s] that lack of notice of a change in enforcement policy may prevent a plaintiff from securing effective relief, and therefore may render an otherwise unripe controversy justiciable." From that reading they contend that defendant's refusal to provide them with notice should it alter its policy renders this ripe. However, that case provided only that the action was not justiciable because the defendant authorities had promised not to enforce the statute and had explicitly waived the statute's provisions in regard to plaintiffs. The court held that it would have to give an advance notice to the individual plaintiff if it decided to revoke its waiver of the statute's applicability to defendants. *Id.* As there is no similar individual waiver of the statutory provisions in this case, plaintiffs' argument is without merit. Moreover, defendants correctly contend that plaintiffs should not have submitted exhibits one and two, because they are statements made in compromise discussions in contravention of Rule 408 of the Federal Rules of Evidence. *See Foster v. WNYC–TV*, 1989 WL 146277 at *6 (S.D.N.Y. Nov.20, 1989) (granting motion to strike exhibits in plaintiff's opposition to motion to dismiss because they were evidence of offers to compromise).

**18.** Plaintiffs contend that if indicted under the Act they would not be able to raise their challenge to the Act before a three-judge panel and would lose their right of direct appeal to the U.S. Supreme Court. However, the establishment of a three-judge panel presumes that the panel has jurisdiction over the case before it. *See American Commuters v. Levitt*, 405 F.2d 1148 (2d Cir. 1969). Jurisdiction is an Article III requirement, and this Court cannot find jurisdiction on the basis that plaintiffs may not be able to establish their entitlement to such a panel in the unlikely event that the Act was enforced against them. Plaintiffs would of course be able to bring a pre-enforcement challenge or a challenge while prosecution was pending, should defendant's policy change, thereby obtaining the benefit of review by a three-judge panel and appeal to the U.S. Supreme Court. In all events, loss of the procedural mechanism of a three-judge court and direct appeal is hard to view as injury in fact to a litigant.

**19.** Plaintiffs do not seek joinder of the congressmen under Rule 19(a)(2)(ii) of the Federal Rules of Civil Procedure, which requires, *inter alia*, that the party to be joined claims an interest relating to the action. Nor has any member of Congress asserted such an interest in appearing or intervening in this action.

matter of the action," presumes that the court had jurisdiction originally, prior to the motion.

Even if plaintiffs' motion for joinder were permitted, adding the congressmen as defendants to the action would not cure its underlying lack of ripeness. Plaintiffs contend that the United States Supreme Court has recognized the interests of Congress or its members in defending statutes when the executive branch declines to do so. *See, e.g., INS v. Chadha,* 462 U.S. 919, 940, 103 S.Ct. 2764, 2778–79, 77 L.Ed.2d 317 (1983); *United States v. Lovett,* 328 U.S. 303, 306, 106 Ct.Cl. 856, 66 S.Ct. 1073, 1074, 90 L.Ed. 1252 (1946). Plaintiffs further argue that two cases, *Karcher v. May,* 484 U.S. 72, 108 S.Ct. 388, 98 L.Ed.2d 327 (1987), and *Yniguez v. State of Arizona,* 939 F.2d 727, 732–33 (9th Cir.1991), implicitly recognize that ripeness of the controversy may exist where, despite executive refusal to defend a statute, legislators defend the statute.

■ Plaintiffs' arguments miss the mark. The joinder of the congressmen would provide the necessary adversity between the parties to this suit, but the issue before the Court relates to questions of ripeness, not standing.[20] To demonstrate that the action is ripe, plaintiffs have to show, in addition to the congressmen's belief in the constitutionality of the statute, the threat or likelihood of imminent harm to plaintiffs.

■ Any credible threat of danger from this Act would stem from plaintiffs' prosecution under it, which as noted is entirely in the hands of the executive branch. It is within the Attorney General's discretion to abstain from prosecuting an individual under a criminal statute. *See St. Martin's Press, Inc.,* 605 F.2d 41, 45 (2d Cir.1979). Congress may not exert control over the Attorney General's decision. *See INS v. Chadha,* 462 U.S. 919, 958, 103 S.Ct. 2764, 2787–88, 77 L.Ed.2d 317 (1983). The Supreme Court thus stated in *Bowsher v. Synar,* 478 U.S. 714, 733–34, 106 S.Ct. 3181, 3191–92, 92 L.Ed.2d 583 (1986), that, "once Congress makes its choice in enacting legislation, its participation ends. Congress can thereafter control the execution of its enactment only indirectly—by passing new legislation."[21]

In *Yniguez,* the Ninth Circuit found that a ballot initiative's sponsor had standing to appeal a decision finding an Arizona Constitutional provision declaring English to be the official language unconstitutional. *Yniguez,* 939 F.2d at 734. On the issue of ripeness the court explicitly found that the action was ripe because the Attorney General had said that he would vigorously enforce the constitutional provision and because the ballot initiative's sponsors were likely to bring a civil suit for enforcement of the constitutional provision against the plaintiff. *Yniguez,* 939 F.2d at 734.

In *Karcher,* the court of appeals' decision stated that individual schools had taken steps to enforce a non-criminal statute that required them to observe a minute of silence at the beginning of the school day. *See May v. Cooperman,* 780 F.2d 240, 241–42 (3d Cir. 1985), *aff'd in part and rev'd in part sub nom. Karcher v. May,* 484 U.S. 72, 83, 108 S.Ct. 388, 395–96, 98 L.Ed.2d 327 (1987). Although state legislators were allowed to intervene in order to establish the requisite adversity, the action was ripe because the public school children plaintiff's First Amendment rights were in imminent danger of being violated by the schools' administrators.

---

**20.** Both standing and ripeness analyses look to the existence of actual and impending injury and, thus, overlap to some extent. Standing is distinct from ripeness, however, because in issues of standing the question regarding the existence of an actual injury arises from the identity of the parties, i.e., whether these plaintiffs will actually be hurt and whether the defendants are likely to inflict such injury. Ripeness asks whether these plaintiffs will suffer injury because of the non-occurrence of events in the causal chain inflicting such an injury, rather than the identity of the parties themselves. *See generally L. Brilmayer,* "The Jurisprudence of Article III," 93 Harv. L.Rev. 297, 298–99 (1979).

**21.** Moreover, Congressmen Hyde and Gingrich, acting in their private, individual capacity, could not require the Attorney General to prosecute plaintiffs under the Act. *See Inmates of Attica Correctional Facility,* 477 F.2d 375, 379 (2d Cir. 1973) (citations omitted).

Because plaintiffs have not shown a credible and imminent threat of the violation of their First Amendment rights, their complaint, whether asserted against the Attorney General or against Congressmen Hyde and Gingrich, lacks sufficient ripeness to be a justiciable case or controversy. Absent any jurisdictional basis for this suit, plaintiffs' motion for joinder of Congressmen Hyde and Gingrich is moot and is, accordingly, denied.[22]

### CONCLUSION

For the reasons stated, plaintiffs' motion for joinder is denied. Defendant's motion to dismiss plaintiffs' complaint for lack of ripeness and justiciability is granted.

The Clerk is directed to enter judgment dismissing the action and to mail a copy of the within to all parties.

SO ORDERED.

---

**22.** In finding that plaintiffs' motion for joinder would not make the complaint ripe, it is unnecessary to decide the merits of plaintiffs' motion.